IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

KEITH STOREY, as Executor of )
the Estate of Valerie Storey )
and Executor of the Estate of )
Kenneth Cartee,              )
                             )
        Plaintiff,           )
                             )
v.                           )        CASE NO. CV415-149
                             )
EFFINGHAM COUNTY; JIMMY      )
MCDUFFIE, individually and in)
his official capacity as     )
Effingham County Sheriff;    )
TRANSFORMHEALTHRX, INC.;     )
EFFINGHAM COUNTY BOARD OF    )
COMMISSIONERS; ASHBY LEE     )
ZYDONYK, Deputy; BRYAN       )
SHEAROUSE, Corporal; CORA MAE)
GAINES, Jailer; DOROTHY HOPF,)
Jailer; GARETT BUCKLES,      )
Jailer; JOHNNY REINHART,     )
Jailer; LATONYA COOPER,      )
Sergeant; LESLIE MINOR, Jail )
Corporal; PAUL DAVIS,        )
Officer; ROBERT L. BROWN,    )
Jail Captain; TIFFANY TISBY, )
Jail Officer; JOHN DOES 1-20;)
ANISA GRANTHAM, LPC, NCAC;   )
REBECCA RANSOM, LPN; JANE    )
DOES 1-10; JOHN DOES         )
PHYSICIANS 1-5; and ALI      )
RAHIMI, M.D.;                )
                             )
        Defendants.          )
_____)

## O R D E R

Before the Court is the Motion for Summary Judgment of

Defendants Effingham County, the Effingham County Board of

Commissioners, (collectively "the County"),[1] and Jimmy McDuffie, individually and in his official capacity as Sheriff of Effingham County. (Doc. 159.) Plaintiff has opposed this motion. (Doc. 219.) For the following reasons, Defendants' motion for summary judgment (Doc. 159) is **GRANTED.**

BACKGROUND[2]

I.   <u>INITIAL ARREST</u>

This case arises out of the 2012 incarceration of Kenneth Cartee at the Effingham County Jail. Early in the morning on September 9, 2012, Cartee called his daughter

---

[1] As the parties have done in their respective briefs, the Court will refer to Defendants Effingham County and the Effingham County Board of Commissioners jointly as "the County." (Doc. 159, Attach. 1 at 1; Doc. 219, Attach. 2 at 3.) However, the Court's analysis and conclusions would not change even if the Defendants were treated as distinct entities.

[2] The relevant facts are taken principally from the parties' statements of undisputed material facts. (Doc. 159, Attach. 2; Doc. 219, Attach. 1.) Pursuant to Federal Rule of Civil Procedure 56(e) and Southern District of Georgia Local Rule 56.1, all material facts not controverted by specific citation to the record are deemed admitted, unless otherwise inappropriate. The Court notes that Plaintiff fails to respond to many of the facts included in the Defendants' statement of material facts. Accordingly, the Court deems the facts included in Defendants' statement of material facts admitted except where Plaintiff clearly disputes these facts. Where Plaintiff does offer conflicting accounts of the events in question, this Court draws all inferences and reviews all evidence in the light most favorable to the non-moving party—Plaintiff. <u>See Hamilton v. Southland Christian Sch., Inc.</u>, 680 F.3d 1316, 1318 (11th Cir. 2012) (citing <u>Moton v. Cowart</u>, 631 F.3d 1337, 1341 (11th Cir. 2011)).

Valerie Storey and told her that he planned to commit suicide.[3] (Doc. 159, Attach. 2 at ¶ 1; Doc. 219, Attach. 1 at ¶ 6; Doc. 159, Attach. 3 at 55.) Ms. Storey called 911 and drove to her father's home. (Doc. 159, Attach. 2 at ¶ 2; Doc. 219, Attach. 1 at ¶ 7.) Two police officers and Jonathan Williams, a family friend, were with Cartee when Ms. Storey arrived. (Doc. 159, Attach. 3 at 56.) The officers attempted to persuade Cartee to be sent for a mental evaluation, which Cartee refused. (Id. at 58.) The police officers spoke to Cartee "for a very long time," but eventually, the officers left the scene for their shift change. (Id. at 56–57.) Ms. Storey and Mr. Williams remained with Cartee after the officers left. (Id. at 59.) Ms. Storey attempted to calm her father, but Cartee responded by putting a knife to her throat and saying, "If I'm going to go, you're going to go." (Doc. 159, Attach. 2 at ¶ 3; Doc. 219, Attach. 1 at ¶ 7.) Mr. Williams was able to separate Ms. Storey from Cartee, and the two drove to a neighbor's house to call 911. (Doc. 159, Attach. 3 at 60.)

---

[3] In their respective statements of material facts, both parties claim that the call took place "[e]arly in the morning of Sunday September 9, 2012." (Doc. 159, Attach. 2 at ¶ 1; Doc. 219, Attach. 2 at ¶ 6.) However, in Valerie Storey's deposition, cited by both parties, Ms. Storey states that the call took place "late at night, approximately 10:00." (Doc. 159, Attach. 3 at 55.) This discrepancy does not affect the Court's analysis.

An officer of the Effingham County Sheriff's Office
("ECSO"), Sergeant Bryan Shearouse, responded to the scene
at approximately 5:00 a.m. and was apprised that Cartee
appeared to be suicidal. (Doc. 159, Attach. 2 at ¶ 4; Doc.
219, Attach. 1 at ¶ 8; Doc. 159, Attach. 4 at 41-42.) Sgt.
Shearouse and Deputy Heather Shaffer made conversation with
Cartee. (Doc. 159, Attach. 4 at 34, 45.) When asked if he
was suicidal, Cartee would respond, "It doesn't matter."
(Id. at 45.) At some point, Cartee handed Sgt. Shearouse a
bottle containing different pills but refused to answer
whether he had taken any pills. (Id. at 47.) Based on
Cartee's behavior and the concern that he was at risk of
harming himself or others, Sgt. Shearouse decided to call
an ambulance and have Cartee checked out by EMT. (Doc. 159,
Attach. 4 at 85-86.) Eventually, Cartee agreed to have EMT
transport him to Effingham Hospital for a voluntary mental
health evaluation. (Id. at 85.)

Cartee was transported to the hospital by ambulance,
with Sgt. Shearouse following in his police cruiser. (Doc.
159, Attach. 2 at ¶ 7; Doc. 219, Attach. 1 at ¶ 11.) While
in transit, Cartee attempted to escape from the ambulance.
(Doc. 159, Attach. 2 at ¶ 8; Doc. 219, Attach. 1 at ¶ 12.)
The ambulance stopped, and Sgt. Shearouse took Cartee into
custody because he determined that Cartee was a danger to

4

himself and others and needed to be taken for an involuntary evaluation. (Doc. 159, Attach. 2 at ¶ 9; Doc. 219, Attach. 1 at ¶ 13; Doc. 159, Attach. 4 at 88.) Sgt. Shearouse then transported Cartee to Effingham Hospital in his police cruiser. (Doc. 159, Attach. 2 at ¶ 9; Doc. 219, Attach. 1 at ¶ 13.)

Upon their arrival at Effingham Hospital, a nurse informed Sgt. Shearouse that she would need a urine sample from Cartee and asked that one of Cartee's handcuffs be removed so that he could provide the sample. (Doc. 159, Attach. 2 at ¶ 10.) Sgt. Shearouse removed Cartee's left handcuff. (Id. at ¶ 11.) Cartee then began walking towards Sgt. Shearouse while pulling on his zipper in a manner that caused Sgt. Shearouse to believe Cartee intended to urinate on him. (Id. at ¶ 12.) Sgt. Shearouse instructed Cartee not to come any closer, but Cartee ignored the directive and raised a closed fist at Sgt. Shearouse. (Id. at ¶¶ 13-15.) Fearing that Cartee would hit him, Sgt. Shearouse pushed Cartee against the wall to immobilize him. (Id. at ¶ 16.) Cartee then tried to hit Sgt. Shearouse with his left arm, and Sgt. Shearouse loudly commanded Cartee to stop fighting. (Id. at ¶ 17.) Sgt. Shearouse was eventually able to force Cartee to the ground. (Id. at ¶ 18.) Cartee

5

continued to resist despite Sgt. Shearouse's instructions and attempts to restrain Cartee. (Id. at ¶ 19.)

Because Cartee refused to comply, Sgt. Shearouse pulled out his Taser and threatened to tase Cartee. (Doc. 159, Attach. 2 at ¶ 20; Doc. 219, Attach. 1 at ¶ 15.) The threat of the Taser caused Cartee to cease resisting momentarily; however, when Sgt. Shearouse attempted to handcuff him, Cartee resumed resisting. (Doc. 159, Attach. 2 at ¶¶ 21-22.) Sgt. Shearouse then placed his knee between Cartee's shoulder and neck to "garner a pain response" in order to get both of Cartee's hands behind his back and cuffed. (Id. at ¶ 23.) At this point, Sgt. Shearouse was able to stand Cartee up, and he generally ceased resisting. (Id. at ¶ 24.) Cartee suffered a minor skin tear to his right wrist during the altercation, and the wound was checked and cleaned by a doctor at the hospital. (Id. at ¶ 25.) Following the altercation, the hospital staff medically cleared Cartee for release. (Id. at ¶ 27.) Sgt. Shearouse arrested Cartee for felony obstruction and transported him to the Effingham County Jail at approximately 11:45 a.m. on September 9, 2012. (Doc. 159, Attach. 2 at ¶ 27; Doc. 159, Attach. 6 at 24.)

## II.  CARTEE'S FIRST STAY AT EFFINGHAM COUNTY JAIL

At the jail, Sergeant Leslie Minor heard Cartee "hollering and cussing" over the dispatch radio as Sgt. Shearouse transported him to the jail. (Doc. 159, Attach. 2 at ¶ 28.) Sgt. Minor notified Officers Dorothy Hopf, Paul Davis, and John Reinhart that Cartee had been "fighting deputies" and instructed them to assist Sgt. Shearouse with bringing Cartee into the jail. (Id. at ¶ 29.) Based on her knowledge that Cartee had already been combative, Sgt. Minor instructed Officer Davis to get the Taser. (Id. at ¶ 30.)

Cartee was reportedly "out of control" when he entered the jail's booking area, screaming and referring to Sgt. Minor with a racial slur. (Id. at ¶ 31.) Officers Reinhart and Hopf removed Sgt. Shearouse's handcuffs from Cartee and instructed him to place his hands flat down on the booking desk. (Id. at ¶ 32.) At this point, Shearouse left the booking area to disinfect his handcuffs but was able to observe Cartee failing to follow the jail officers' commands from the doorway of the adjacent room. (Id. at ¶¶ 33-34.) Cartee refused the officers' commands to spread his feet. (Id. at ¶ 35.) When the officers attempted to put Cartee's hands on the table and told Cartee to keep them

there, Cartee "snatched them away" and told the officers, "I know what I'm doing." (Id. at ¶ 37.)

Plaintiff claims that at no point during this altercation did Cartee attempt to assault an officer. (Doc. 219, Attach. 1 at ¶ 25.) According to Sgt. Minor, however, whenever an officer attempted to restrain Cartee, he would swing his arms wildly and almost hit Officer Reinhart in the face at one point. (Doc. 159, Attach. 5 at 234–35.) Because the other officers were unable to restrain Cartee, Cartee was refusing the officers' commands, and Cartee had already fought Sgt. Shearouse at the hospital, Officer Davis deployed his Taser's prongs towards Cartee, which attached to his abdominal area. (Doc. 159, Attach. 2 at ¶ 41; Doc. 159, Attach. 7 at 10.) The shock from the Taser caused Cartee to fall onto Officer Reinhart, and they in turn fell together onto a row of plastic chairs. (Doc. 159, Attach. 2 at ¶¶ 42–43.)

The officers then gained control over Cartee, removed the Taser prongs, and placed Cartee in a restraint chair in a holding cell to give him time to calm down. (Id. at ¶ 44.) Sgt. Minor called the on-call telephone number for the jail's contracted medical provider TransformHealthRX's ("THRX") and requested that a nurse come to the jail to examine Mr. Cartee. (Id. at ¶ 46.) Nurse Marilyn Spikes

8

arrived soon thereafter, but Cartee refused to allow her to examine him. (Id. at ¶ 47.) Officer Reinhart and Sgt. Minor removed Cartee from the restraint chair later that day, around 1:45 p.m. (Doc. 159, Attach. 6 at 59.) According to Officer Reinhart, Cartee appeared normal and did not complain of injuries at this time. (Id. at 60.) Cartee's combative behavior continued through Monday, September 10, 2012, and as a result, jail staff were unable to fully book him into the jail.[4]

At approximately 6:00 p.m. Monday, September 10, 2012, Nurse Rebecca Ransom, THRX's weekday nurse, assessed Cartee. (Doc. 159, Attach. 2 at ¶ 51.) Cartee indicated that he had previously taken illicit drugs, and Nurse Ransom concluded that his behavior was possibly drug-induced as opposed to the result of a mental illness. (Id.

---

[4] Plaintiff alleges that Cartee was left strapped naked to the restraint chair from when he was first placed in the holding cell on September 9, 2012, until 6:00 p.m. Monday, September 10, 2012, when he was examined by Nurse Rebecca Ransom. (Doc. 219, Attach. 1 at ¶ 28.) In support of this allegation, Plaintiff cites to a message sent by Megan Miley, a THRX nurse, on September 10, 2012. (Doc. 159, Attach. 10 at 314.) The message states that "[Cartee] has been combative all day with officers and they have been unable to book. Inmate was placed in the restraint chair[,] and Nurse Rebecca was sent back to evaluate[] inmate." (Id.) This message does not rebut Reinhart's testimony that Cartee was removed from the restraint chair on September 9, 2012, rather it merely shows that officers were forced to place Cartee back in the restraint chair on September 10, 2012, due to Cartee's aggressive behavior.

at ¶ 52.) After consulting with a supervisor, Nurse Ransom obtained an order to send Cartee back to Effingham Hospital for a mental health evaluation. (Id. at ¶ 53.)

Patrol Officer Ashby Zydonyk was instructed to transport Cartee back to Effingham Hospital. (Id. at ¶ 55.) Officer Zydonyk arrived at the holding cell and found Cartee alone and secured in a restraint chair. (Id. at ¶ 56.) Officers Zydonyk and Reinhart entered the cell together to remove Cartee from the chair. (Id. at ¶ 57) Officer Zydonyk removed the nylon straps that were securing Cartee to the chair and asked Cartee to stand up several times. (Id. at ¶ 60.) Cartee refused to stand up voluntarily, so Officer Zydonyk took hold of Cartee's arm to lift him to his feet. (Id. at ¶ 61.) Cartee then became combative, pulling away and flailing his arms in a manner consistent with the previous incidents. (Id. at ¶ 62.) Officer Zydonyk immediately took Cartee to the ground to gain control of the situation, but Cartee continued to resist. (Id. at ¶¶ 63-64.) With the help of Officer Garrett Buckles, the officers were able to secure handcuffs and leg irons on Cartee and lift him to his feet, but Cartee continued to struggle and resist the officers' efforts to remove him from the holding cell. (Id. at ¶¶ 65-69.) According to Officer Reinhart, "[t]he officers had [Cartee]

10

by each arm, and he'd pick his legs up and try to push us away or push against a wall, actually resisting[,] not trying to get out of the holding cell." (Doc. 159, Attach. 6 at 74.) To get Cartee to stop resisting, Officer Reinhart applied the Taser in drive-stun[5] mode to Cartee's hip.[6] (Id. at 75.)

The officers were then able to get Cartee out of the holding cell and into the booking area. (Doc. 159, Attach. 2 at ¶ 71.) Cartee began resisting again and refused to walk, so the Officers carried him out of the jail to the jail's transport vehicle. (Id. at ¶¶ 72, 74.) Officer Zydonyk then placed Cartee in the transport vehicle and drove him to the hospital along with Officer Reinhart. (Id. at ¶ 74.)

III. CARTEE IS TREATED AT GEORGIA REGIONAL FOR MENTAL ILLNESS

At approximately 7:00 p.m. on September 10, 2012, officers carried Cartee into the emergency room of

---

[5] Drive-stun mode allows a Taser to be used like a stun gun-meaning the Taser is pressed directly against the skin and produces a burning sensation. (Doc. 159, Attach. 2 at ¶ 70 n.1 (citing Mingo v. City of Mobile, 592 F. App'x 793, 796 n.1 (11th Cir. 2014)).)

[6] The officers' accounts differ on whether Officer Reinhart used the Taser on Cartee while Cartee was still on the ground or after he had been lifted to his feet. (Doc. 159, Attach. 2 at ¶ 70 n.2; Doc. 219, Attach. 1 at ¶ 39.) The Court will construe this fact in the light most favorable to Plaintiff and assume Cartee was still on the ground at the time Officer Reinhart tased him.

Effingham Hospital, where hospital staff gave Cartee multiple sedative injections to control his disorderly behavior. (Id. at ¶ 77.) Cartee remained at Effingham Hospital until 3:00 a.m. on September 11, 2012, when, in accordance with a physician's orders, Officer Zydonyk transported Cartee to Georgia Regional Hospital to receive mental health care. (Id. at ¶ 78.)

Cartee was hospitalized at Georgia Regional from September 11, 2012, until September 17, 2012. (Id. at ¶ 79.) At Georgia Regional, Cartee began to display signs that he was suffering from at least partial paralysis. (Id. at ¶ 81.) For example, on September 13, 2012, a social worker met with Cartee and found him using a wheelchair because, according to Cartee, he could not walk. (Id.) According to Cartee's Georgia Regional records, Cartee was initially disorderly, but "[o]ver the course of his stay[,] he did not present as an imminent danger to himself or others." (Doc. 159, Attach. 14 at 57.) "By [September 17, 2012,] he was felt appropriate to discharge back to the jail." (Id.)

IV.  CARTEE'S SECOND STAY AT EFFINGHAM COUNTY JAIL

When Deputy Robert Plank arrived at Georgia Regional to transport Cartee back to the jail at 11:00 a.m. on September 17, 2012, a nurse informed him that Cartee had

been unable to walk at times, so he sometimes used a wheelchair. (Doc. 159, Attach. 2 at ¶ 83.) Deputy Plank asked the nurse whether a wheelchair was necessary to move Cartee to the transport vehicle, and the nurse replied, "No. He's walking." (Id. at ¶ 84.) With handcuffs and leg irons applied, Cartee walked approximately 35-40 feet from the Georgia Regional facility to Deputy Plank's vehicle in the parking lot. (Id. at ¶ 85.) On the ride back to the jail, Cartee informed Deputy Plank that he was "not getting out of this car." (Id. at ¶ 86.) Deputy Plank radioed the jail for assistance, and with the help of Officers Davis and Reinhart, the officers were able to get Cartee out of the car and into the jail. (Id. at ¶¶ 87-89.)

Later that same day, Nurse Ransom conducted an intake exam of Cartee but did not roll up the sleeves of Cartee's jail uniform.[7] (Id. at ¶ 90-91.) The next day at approximately 10:00 a.m., Cartee was examined by THRX's

---

[7] The note from Nurse Ransom's September 17, 2012, exam describes Nurse Ransom's observations as follows:
> "[Cartee] was ambulatory upon leaving [the jail] and returned stating he could not walk. No obvious trauma to legs. Observed inmate bending and moving both legs. Also witnessed [Cartee] standing at door in booking area upon return from GA regional. Deputy Plank, who transported [Cartee] from GA regional, states that he observed inmate walking at GA regional before pick up."

(Doc. 159, Attach. 9 at 7.)

Licensed Professional Counselor, Anisa Grantham. (Id. at ¶ 92.) Although Cartee told Grantham, "I can't walk," Grantham observed Cartee bending his knees to sit on the side of the bunk and was "not convinced [Cartee could] not walk." (Doc. 159, Attach. 9 at 8.)

Later in the day on September 18, 2012, Officer Davis was instructed to escort Cartee from the isolation cell to the booking area for his bond hearing. (Doc. 159, Attach. 2 at ¶ 94.) When Officer Davis informed Cartee that he was needed in the booking area, Cartee stood up but told Officer Davis that he could not walk. (Id. at ¶¶ 96-97.) Officer Davis spent approximately five minutes unsuccessfully instructing Cartee to walk and reminding Cartee that he had seen Cartee walk the previous day. (Id. at ¶ 98.) Officer Davis then went to the booking area to inform Captain Robert Brown of Cartee's refusal, and Captain Brown instructed Officer Davis to use the tools available to him. (Id. at ¶ 99.)

Officer Davis returned to Cartee's isolation cell with a Taser and announced, "Mr. Cartee, we need to escort you to booking, or I'm going to have to tase you." (Id. at ¶ 100; Doc. 159, Attach. 7 at 21.) When Cartee still refused to walk, Officer Davis applied the Taser in drive-stun mode onto Cartee's lower thigh. (Doc. 159, Attach. 2

at ¶ 102.) Officer Reinhart was standing just inside the door of the isolation cell when Officer Davis used the Taser on Cartee. (Id. at ¶ 101.) According to Officer Reinhart, when Officer Davis used the Taser on Cartee, his "legs would move, he would squirm," making Officer Reinhart believe Cartee's legs were operable. (Doc. 159, Attach. 6 at 106.) After Cartee was initially stunned, he pulled away and attempted to grab the Taser. (Doc. 159, Attach. 2 at ¶ 103.) Officer Davis attempted to drive stun Cartee two additional times but remains unsure whether he contacted Cartee's thigh. (Id. at ¶ 104.) Officer Tiffany Tisby then retrieved a wheelchair which was used to escort Cartee to the booking area without further incident. (Id. at ¶ 106.)

On September 20, 2012, jail officers informed Sergeant Latonya Cooper that they were having to assist Cartee in using the toilet because Cartee was complaining that he could not walk. (Id. at ¶ 107.) Sgt. Cooper went to check on Cartee herself, and Cartee told Sgt. Cooper that he could not walk. (Id. at ¶¶ 108-109.) After Sgt. Cooper discussed the situation with Nurse Ransom, the decision was made to transport Cartee back to Effingham Hospital. (Id. at ¶ 110.) Sgt. Cooper transported Cartee to Effingham Hospital at approximately 10:00 a.m. on September 20, 2012. (Id. at ¶ 111.)

While at Effingham Hospital, Sgt. Cooper learned that Cartee had been diagnosed with renal failure. (<u>Id.</u> at ¶ 112.) Cartee was released from custody on his own recognizance later that day. (<u>Id.</u> at ¶ 113.) After his release from custody, Cartee was taken to Memorial Hospital, where he was diagnosed with a cervical spinal cord injury and T11 vertebral fracture which caused partial paralysis. (<u>Id.</u> at ¶ 115.) Cartee was also diagnosed with several broken ribs, sepsis; and severe dehydration.[8] (Doc. 219, Attach. 1 at ¶ 58.) Cartee remained at Memorial Hospital until October 22, 2012, when he was transferred to Woodlands Healthcare and Rehabilitation Center ("Woodlands"), an extended care facility. (Doc. 72 at 21.) Cartee was discharged from Woodlands on April 23, 2013, with hospice services. (<u>Id.</u> at 33.) Cartee died on June 25,

---

[8] The Court notes that the parties have not provided Cartee's medical records from Memorial Hospital that would show when and where Cartee received his exact diagnosis. Instead, Plaintiff cites to the deposition of his expert witness, Inna Sheyner, M.D. (Doc. 219, Attach. 1 at ¶¶ 88-90 (citing Doc. 219, Attach. 25 at 25).) Dr. Sheyner testified to his review of Cartee's medical history prior to his transfer from Memorial Hospital but did not state when Cartee's conditions were diagnosed. (Doc. 219, Attach. 25 at 25.) However, because Defendants have not objected to this fact, the Court will assume for purposes of this order that Cartee was diagnosed with a cervical spinal cord injury, a T11 vertebral fracture, broken ribs, sepsis, and severe dehydration at Memorial Hospital on September 20, 2012.

2013, at home from cardiopulmonary arrest, respiratory failure, and adult failure to thrive. (Id.)

V.   PROCEDURAL HISTORY

Valerie Storey, individually and as executrix of Cartee's estate, filed this renewal action on May 20, 2015, alleging multiple federal and state law causes of actions against individuals and entities involved in Cartee's incarceration and medical treatment. (Doc. 1.) Following Ms. Storey's death, her husband, Keith Storey, was substituted as the party plaintiff in this case. (Doc. 137.) Relevant to this motion, in the Second Amended Complaint, Plaintiff alleges two causes of action against the County and Sheriff McDuffie in his official and individual capacities. (Doc. 72.) Count 1 alleges a 42 U.S.C. § 1983 claim against Defendants for their alleged deliberate indifference to Cartee's medical needs while incarcerated.[9] (Id. at 22-25.) Count 2 alleges a claim under Georgia tort law that appears to be based on Defendants' supervisory liability for the conduct of its employees which led to Cartee's injuries and death. (Id. at 25-30.) Plaintiff seeks compensatory and punitive damages for both

---

[9] To the extent that the Second Amended Complaint could be construed to assert a claim for excessive force, Plaintiff concedes in his responsive brief that he is not asserting such a claim in this action. (Doc. 219, Attach. 2 at 1.)

causes of action. Now, the County and Sheriff McDuffie move jointly for summary judgment on Plaintiff's claims against them. (Doc. 159.)

## STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial[.]' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines which facts are material. DeLong Equip. Co. v. Wash. Mills Abrasive

Co., 887 F.2d 1499, 1505 (11th Cir. 1989) (citing Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505,

2510, 91 L. Ed. 2d 202 (1986)).

> As the Supreme Court explained:
>
> [A] party seeking summary judgment always bears
> the initial responsibility of informing the
> district court of the basis for its motion, and
> identifying those portions of the pleadings,
> depositions, answers to interrogatories, and
> admissions on file, together with the affidavits,
> if any, which it believes demonstrate the absence
> of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (internal

quotation marks omitted). The burden then shifts to the

nonmoving party to establish, by going beyond the

pleadings, that there is a genuine issue concerning facts

material to its case. Clark v. Coats & Clark, Inc., 929

F.2d 604, 608 (11th Cir. 1991). The Court must review the

evidence and all reasonable factual inferences arising from

it in the light most favorable to the nonmoving party.

Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356 (quoting

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.

Ct. 993, 994, 8 L. Ed. 2d 176 (1962)). However, the

nonmoving party "must do more than simply show that there

is some metaphysical doubt as to the material facts." Id.

at 586, 106 S. Ct. at 1356 (citations omitted). A mere

"scintilla" of evidence or simply conclusory allegations

will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989)(citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

**ANALYSIS**

Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims against them. Defendants argue that Plaintiff's § 1983 claim against the County and Sheriff McDuffie in his official capacity fails because there is no evidence that Cartee suffered a constitutional injury or that a policy of the County or the ECSO caused a constitutional violation. (Doc. 159, Attach. 1 at 2.) Defendants also argue that Plaintiff's § 1983 claim against Sheriff McDuffie in his individual capacity fails because there is no basis to hold him liable under a supervisory liability theory. (Id.) Further, Defendants argue that Plaintiff's state law claims against the County and Sheriff McDuffie in his official capacity are barred by sovereign immunity and that the state law claims against

Sheriff McDuffie in his individual capacity are barred by official immunity. (Id.)

In response, Plaintiff states that he is no longer asserting state law claims against the County or Sheriff McDuffie in his official capacity. (Doc. 219, Attach. 2 at 3.) Accordingly, the Court **GRANTS** Defendants summary judgment on these claims. See Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citation omitted)). Plaintiff, however, opposes summary judgment for his § 1983 claims and his state law claims against Sheriff McDuffie in his individual capacity. (Doc. 219, Attach. 2 at 3.) As discussed below, the Court finds that Defendants are entitled to summary judgment on all of Plaintiff's claims.

I. <u>PLAINTIFF'S § 1983 CLAIMS AGAINST THE COUNTY AND SHERIFF MCDUFFIE IN HIS OFFICIAL CAPACITY</u>

The Court will first address Plaintiff's § 1983 claims against the County and Sherriff McDuffie in his official capacity. As an initial matter, the Court must discuss an issue not raised by the parties. When a plaintiff brings a § 1983 action against a local government official in his or her official capacity, "the suit is simply another way of pleading an action against an entity of which an officer is

an agent." <u>Busby v. City of Orlando</u>, 931 F.2d 764, 776 (11th Cir. 1991) (internal quotation marks omitted) (quoting <u>Kentucky v. Graham</u>, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)). In this case, the parties appear to believe that Plaintiff's official capacity claim against Sheriff McDuffie is the functional equivalent of his § 1983 claim against the County. (Doc. 159, Attach. 1 at 14; Doc. 219, Attach. 2 at 4.) The parties' shared belief appears to be contrary to binding precedent. In Georgia, courts have held that sheriffs act as an agent for the state, rather than the county, when conducting law enforcement activities, including the administration of correctional facilities. <u>Purcell ex. rel. Estate of Morgan v. Toombs Cnty.</u>, 400 F.3d 1313, 1325 (11th Cir. 2005) ("Sheriff Kight functions as an arm of the State—not of Toombs County—when promulgating policies and procedures governing conditions of confinement at the Toombs County Jail.");[10] <u>see also</u> <u>Bell v. Houston Cnty.</u>, No.

_____

[10]  It is worth noting that Georgia courts have made compelling arguments that sheriffs act as agents of the county, not the State, when providing medical care in correctional facilities. <u>See</u> <u>Dukes v. Georgia</u>, 428 F. Supp. 2d 1298, 1319-22 (N.D. Ga. 2006) (finding sheriff was not acting as an arm of the State when caring for inmate's medical needs); <u>Hamm v. Spalding Cnty.</u>, No. 3:10-cv-192-TCB, 2012 WL 13085215, at *5-7 (N.D. Ga. Feb. 21, 2012) (same). Yet, the Eleventh Circuit has made clear that <u>Purcell</u>, despite its flaws, has not been overruled and

5:04-CV-390 (DF), 2006 WL 1804582 (M.D. Ga. June 27, 2006)
("[U]nder Georgia law, Houston County ha[d] no authority to
promulgate or administer the jail policy." (citing Manders
v. Lee, 338 F.3d 1304, 1310-11 (11th Cir. 2003)). This
would imply that Plaintiff's official capacity suit against
Sheriff McDuffie is really a suit against the State of
Georgia, rather than the County. Busby, 931 F.2d at 776.
However, whether the Court treats Sheriff McDuffie as an
agent of the State or of the County, Defendants are
entitled to summary judgment because Plaintiff has failed
point to any unconstitutional policy or custom of the
County or the State that caused his injuries.

A local government entity cannot be held liable under
§ 1983 on a respondeat superior theory. Monell v. Dep't of
Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L.
Ed. 2d 611 (1978); see also Scala v. City of Winter Park,
116 F.3d 1396, 1399 (11th Cir. 1997). Instead, "[a] local
government may be held liable under § 1983 only for acts
for which it is actually responsible, acts which the local
government has officially sanctioned or ordered." Turquitt
v. Jefferson Cnty., 137 F.3d 1285, 1287 (11th Cir. 1998)
(citations omitted). Therefore, "[t]o state a Monell claim,

---

remains binding precedent. Andrews v. Biggers, 996 F.3d
1235, 1236-37 (11th Cir. 2021) (Rosenbaum, concurring).

a plaintiff must allege facts showing: '(1) that his constitutional rights were violated; (2) that the [county] had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.' " Marantes v. Miami-Dade Cnty., 649 F. App'x 665, 672 (11th Cir. 2016) (per curiam) (quoting McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)). Here, even assuming Plaintiff suffered a constitutional injury, Plaintiff has failed to satisfy the last two prongs of a Monell-claim—namely, that an unconstitutional policy existed that caused his injuries.

To establish the existence of an unconstitutional policy, Plaintiff must identify either "(1) an officially promulgated [government] policy or (2) an unofficial custom or practice of the [government entity]." Grech v. Clayton Cnty., 335 F.3d 1326, 1329 (11th Cir. 2003) (citations omitted). Plaintiff has failed to identify any officially promulgated policy that led to a constitutional violation in this case. Notably, to support his claim that a constitutional violation occurred, Plaintiff alleges that "[t]he Defendants' failure to provide adequate medical care for Cartee was [] in violation of JSOP 17.3 and 17.6 of Effingham County Jail Operations Manual, which mandate

providing emergency medical services and prescribed medications to inmates." (Doc. 219, Attach. 2 at 7.) By arguing that a violation of the jail's policies is unconstitutional, Plaintiff is necessarily conceding that the official policies are constitutional if followed. See McRae v. Telfair Cnty., No. CV 318-077, 2020 WL 5608537, at *6 (S.D. Ga. Sept. 18, 2020) ("[I]t was not the policy that caused [the plaintiff's] injury, but the violation of it.").

Plaintiff has also failed to show the existence of an unofficial custom or practice that led to his injuries. To make this showing, a plaintiff must demonstrate the existence of "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law[.]" Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (internal quotation marks and citation omitted). Plaintiff, without citation to the record, asserts that the County had a custom of neglecting the medical needs of inmates at the jail. (Doc. 219, Attach. 2 at 7.) Nevertheless, besides Cartee's alleged injuries, Plaintiff has not identified a single other occurrence of deliberate indifference at the Effingham County Jail. Torres-Bonilla v. City of

<u>Sweetwater</u>, 805 F. App'x 839, 841 (11th Cir. 2020) (per curiam) (finding evidence that a plaintiff suffered a constitutional violation "is not enough to create a genuine dispute that this kind of activity 'was a widespread practice . . . so permanent and well settled as to constitute a custom or usage with the force of law.' " (quoting <u>Brown</u>, 923 F.2d at 1481)).

Lastly, Plaintiff argues that the County may be held liable under § 1983 because Sheriff McDuffie acted as a final policymaker as to all matters concerning the care of inmates and detainees in the Effingham County Jail. (Doc. 219, Attach. 2 at 5.) Plaintiff is correct that a government entity may be held liable under <u>Monell</u> if an individual it vested with "ultimate, non-reviewable decision-making authority for the challenged action or policy" approved or implemented the unconstitutional action in question. <u>See</u> <u>Williams v. Fulton Cnty. Sch. Dist.</u>, 181 F. Supp. 3d 1089, 1124 (N.D. Ga. 2016) (citing <u>Scala</u>, 116 F.3d at 1398-1403). Yet, Plaintiff's contention that the County can be held liable for Sheriff McDuffie's actions is unavailing.

Importantly, as stated previously, the record is devoid of any evidence that Sheriff McDuffie or the County had an unconstitutional policy or custom of denying medical

care for inmates at the Effingham County Jail. As Defendants highlight, Plaintiff has not shown that Sheriff McDuffie personally participated in or approved any of the alleged constitutional violations. (Doc. 159, Attach. 1 at 18.) Thus, the Court declines to find that Sheriff McDuffie's conduct created a basis for Defendants' liability under a final policymaker theory. Cf. Cooper v. Dillon, 403 F.3d 1208, 1222-23 (11th Cir. 2005) (finding city liable for police chief's decision to enforce unconstitutional statute). Based on the foregoing, the Court finds that Plaintiff has failed to establish a basis for entity liability under Monell. Accordingly, the Court **GRANTS** summary judgment on Plaintiff's § 1983 deliberate indifference claims against the County and Sheriff McDuffie in his official capacity.

II. PLAINTIFF'S § 1983 CLAIMS AGAINST SHERIFF MCDUFFIE IN HIS INDIVIDUAL CAPACITY

The Court will now turn to Plaintiff's § 1983 claim against Sheriff McDuffie in his individual capacity. "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the [Fourteenth] Amendment." Marsh v. Butler Cnty., 268 F.3d

27

1014, 1028 (11th Cir. 2001) (en banc) (citation omitted).[11]
"However, '[i]t is well established in this Circuit that
supervisory officials are not liable under § 1983 for the
unconstitutional acts of their subordinates on the basis of
respondeat superior or vicarious liability.' " Keith v.
Dekalb Cnty., 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting
Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003),
abrogated in part on other grounds by Randall v. Scott, 610
F.3d 701 (11th Cir. 2010)). Instead, a plaintiff must show
that the prison official personally engaged in
unconstitutional conduct or that the supervisor's actions
are causally connected to the alleged constitutional
violation. Keith, 749 F.3d at 1047-48 (citing Cottone, 326
F.3d at 1360).

As discussed in the preceding section, Plaintiff has
not adduced any instance in which Sheriff McDuffie
participated in the alleged unconstitutional conduct
towards Cartee.[12] However, Plaintiff argues that his

---

[11] See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir.
2007) (explaining Fourteenth Amendment governs pretrial
detainee deliberate indifference claims but that the
standards under the Fourteenth Amendment are identical to
those under the Eighth).
[12] In in his brief in response to this summary judgment
motion, Plaintiff states that he "has alleged, and the
evidence shows, not merely questionable, negligent medical
decisions by these Defendants but, rather, the complete
denial of medical care to Kenneth Cartee . . . ." (Doc.

individual capacity claim against Sheriff McDuffie should survive summary judgment based on a theory of supervisory liability. (Doc. 219, Attach. 2 at 11-12.) Specifically, Plaintiff argues that Sheriff McDuffie breached a duty imposed by Georgia law, in O.C.G.A. §§ 15-13-1[13] and 42-5-2(a), and this breach led to Cartee's injuries. (Id. at 11.)

Although Plaintiff does not explain how Sheriff McDuffie violated Georgia law, it appears that his argument is that Sheriff Mcduffie violated O.C.G.A. § 42-5-2(a) by failing to provide appropriate medical care to Cartee. However Georgia courts have interpreted O.C.G.A. § 42-5-2 as requiring sheriff defendants to "merely to provide inmates with access to medical care" but not addressing "[w]hat is considered proper medical care . . . ." Epps v. Gwinnett Cnty., 231 Ga. App. 664, 670, 499 S.E.2d 657, 663 (1998). As Defendants highlight, it is undisputed that

219, Attach. 2 at 7.) It appears Plaintiff simply copied and pasted this portion of his brief from his response in opposition to the summary judgment motion of the ECSO Officers, against whom Plaintiff did allege unconstitutional actions. Compare (Doc. 219, Attach. 2 at 7), with (Doc. 218, Attach. 2 at 11-12). Accordingly, the Court finds Plaintiff failed to point to any evidence supporting a finding that Sheriff McDuffie personally participated in the alleged constitutional violations in this case.

[13] As Defendants note, it appears that Plaintiff mistakenly cited to O.C.G.A. § 15-3-1, when he intended to cite to O.C.G.A. § 15-13-1.

Sheriff McDuffie contracted with THRX to provide medical care for inmates at the jail. (Doc. 243 at 8.) To the extent that Plaintiff is arguing that Cartee was provided improper medical care, O.C.G.A. § 42-5-2(a) is not implicated. Lynch v. Fulton Cnty., No. 1:09-CV-3306-CAP, 2010 WL 11508021, at *10 (N.D. Ga. Feb. 5, 2010) (finding O.C.G.A. § 42-5-2 was not implicated because it was "uncontested that Plaintiff was provided access to dental/medical care"). To hold otherwise would implicate a sheriff's individual liability anytime a plaintiff received inadequate medical care, essentially abrogating the rule against respondeat superior liability in § 1983 actions.

Unable to show Sheriff McDuffie directly caused Cartee's constitutional injuries, Plaintiff must demonstrate that Sheriff McDuffie failed to correct a widespread pattern of constitutional violations or adopted a custom or policy that deprived Cartee of his constitutional rights. Cottone, 326 F.3d at 1360, 1360 (11th Cir. 2010). As discussed in the previous section, Plaintiff failed to produce evidence of previous constitutional violations or that Sheriff McDuffie had adopted a custom or policy that caused Cartee's injuries. Accordingly, the Court finds that Plaintiff has failed to establish Sheriff McDuffie's individual liability under

§ 1983 for his alleged denial of medical care. As a result, the Court **GRANTS** summary judgment to Sheriff McDuffie on Plaintiff's individual capacity § 1983 claim.[14]

## III. PLAINTIFF'S STATE LAW CLAIMS AGAINST SHERIFF MCDUFFIE IN HIS INDIVIDUAL CAPACITY

Lastly, the Court will address whether Plaintiff's state law claims against Sheriff McDuffie in his individual capacity are barred by official immunity. In Georgia, official, or qualified, immunity protects law enforcement officers from personal liability for discretionary acts taken within the scope of their official authority and performed without malice. Gish v. Thomas, 302 Ga. App. 854, 857, 691 S.E.2d 900, 904 (2010) (citing Cameron v. Lang, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001)). Official immunity does not protect officers from liability for negligently performing ministerial acts or performing discretionary acts with malice or an intent to injure. Cameron, 274 Ga. at 123, 549 S.E.2d at 344.

---

[14] In his response brief, Plaintiff alleges for the first time that Sheriff McDuffie should be held liable on a negligent hiring and supervision theory. (Doc. 219, Attach. 2 at 11-12.) This claim was not raised in the Second Amended Complaint and is not properly before the Court. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Even if it were, Plaintiff has produced no evidence to show Sheriff McDuffie engaged in hiring decisions that reflect a deliberate indifference to the risk that a constitutional violation will occur. See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1313 (11th Cir. 2001)

The Georgia Supreme Court has described the difference between ministerial and discretionary acts as follows:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

McDowell v. Smith, 285 Ga. 592, 593, 678 S.E.2d 922, 924 (2009) (quoting Murphy v. Bajjani, 282 Ga. 197, 199, 647 S.E.2d 54, 57 (2007)). Further, "[t]he determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." McDowell v. Smith, 285 Ga. 592, 594-95, 678 S.E.2d 922, 925 (2009) (quoting Reece v. Turner, 284 Ga. App. 282, 285, 643 S.E.2d 814, 817 (2007).

Plaintiff contends that providing medical care for inmates is a duty imposed on sheriffs by law and is, therefore, a ministerial act. (Doc. 219, Attach. 2 at 13-15.) Plaintiff is correct that simply providing access to medical care for an inmate is a ministerial act by the sheriff. (Id. at 13 (citing Howard v. City of Columbus, 239 Ga. App. 399, 411, 521 S.E.2d 51, 66 (1999)). However, "[t]he determination of what medical treatment to provide

**is** an act of discretion subject to official immunity." Howard, 39 Ga. App. at 411, 521 S.E.2d 51, at 66 (emphasis in original) (quotation omitted). In this case, Plaintiff does not dispute that Sheriff McDuffie contracted with THRX to provide health care for inmates at the jail. Rather, Plaintiff takes issue with **how** Sheriff McDuffie supervised and trained prison employees to provide medical care.[15] (Doc. 219, Attach. 2 at 15.)

Georgia courts have consistently held that a sheriff's decision on how to provide medical care to inmates is discretionary under Georgia law. Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1310 (S.D. Ga. 2013) (collecting cases); see also Graham v. Cobb Cnty., 316 Ga. App. 738, 743, 730 S.E.2d 439, 444 (2012) (finding "the determination of how to provide adequate medical care to the prisoners at the jail involved the use of discretion by [the sheriff]"); Harvey v. Nichols, 260 Ga. App. 187, 191, 581 S.E.2d 272, 276 (2003) (finding that sheriff engaged in discretionary function with respect to "operation of the jail, the supervision of its officers and employees, and the establishment of policies and procedures"), disapproved of

---

[15] Although the decision to provide medical care and train officers to provide that care is ministerial, the decision on how to train officers to provide that care is discretionary. See Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1310 (S.D. Ga. 2013).

on other grounds by City of Richmond Hill v. Maia, 301 Ga.
257, 261, 800 S.E.2d 573, 578 (2017). The Court will not
depart from the holding of these cases and finds that
Sheriff McDuffie was engaged in discretionary conduct in
determining how to provide medical care for inmates at the
jail.

Additionally, despite Plaintiff's assertion to the
contrary (Doc. 219, Attach. 2 at 15), the record is devoid
of evidence showing that Sheriff McDuffie acted with
malice. To show actual malice, a plaintiff needs to show
that a defendant acted with "a deliberate intention to do
wrong." Keele, 938 F. Supp. 2d at 1309 (quoting Peterson v.
Baker, 504 F.3d 1331, 1339 (11th Cir. 2007)). As discussed
throughout this order, Plaintiff has not shown that Sheriff
McDuffie made any decisions regarding Cartee's
incarceration, much less that Sheriff McDuffie acted with
malice towards him. Id. at 1310. Because the Court finds
that Sheriff McDuffie was engaged in discretionary conduct
and did not act with malice, Sheriff McDuffie is entitled
to official immunity. Accordingly, summary judgment is
**GRANTED** on Plaintiff's state law claims against Sheriff
McDuffie in his individual capacity.[16]

---

[16] Because the Court has concluded that Defendants are
entitled to summary judgment with respect to all of

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Doc. 159) is **GRANTED**. As a result, Defendants Effingham County, the Effingham County Board of Commissioners, and Jimmy McDuffie are **DISMISSED** from this action. The Clerk of Court is **DIRECTED** to amend the caption accordingly.

SO ORDERED this 31ˢᵗ day of January 2022.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

Plaintiff's substantive claims, Plaintiff punitive damages claims are likewise **DISMISSED**. See <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1304-1305 (11th Cir. 2009).