IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

KEITH STOREY, as Executor of    )
the Estate of Valerie Storey    )
and Executor of the Estate of   )
Kenneth Cartee,                 )
                                )
        Plaintiff,              )
                                )
v.                              )        CASE NO. CV415-149
                                )
TRANSFORMHEALTHRX, INC.; ASHBY  )
LEE ZYDONYK, Deputy; BRYAN      )
SHEAROUSE, Corporal; CORA MAE   )
GAINES, Jailer; DOROTHY HOPF,   )
Jailer; GARETT BUCKLES, Jailer; )
JOHNNY REINHART, Jailer;        )
LATONYA COOPER, Sergeant;       )
LESLIE MINOR, Jail Corporal;    )
PAUL DAVIS, Officer; ROBERT L.  )
BROWN, Jail Captain; TIFFANY    )
TISBY, Jail Officer; JOHN DOES  )
1-20; ANISA GRANTHAM, LPC,      )
NCAC; REBECCA RANSOM, LPN; JANE )
DOES 1-10; JOHN DOES PHYSICIANS )
1-5; and ALI RAHIMI, M.D.;      )
                                )
        Defendants.             )
                                )

## O R D E R

Before the Court is Defendants Ashby Lee Zydonyk, Bryan

Shearouse, Cora Mae Gaines, Dorothy Hopf, Garett Buckles, Johnny

Reinhart, Latonya Cooper, Leslie Minor, Paul Davis, Robert L.

Brown, and Tiffany Tisby's, (collectively "ECSO Officers"),[1]

Motion for Summary Judgment (Doc. 161), which Plaintiff has

---

[1] Plaintiff sued the ECSO Officers in their individual and official capacities. (Doc. 72 at ¶ 10.)

opposed (Doc. 218). For the following reasons the ECSO Officers'
motion for summary judgment (Doc. 161) is **GRANTED**.

## BACKGROUND[2]

### I.   INITIAL ARREST

This case arises out of the 2012 incarceration of Kenneth
Cartee at the Effingham County Jail. Early in the morning on
September 9, 2012, Cartee called his daughter, Valerie Storey,
and told her that he planned to commit suicide.[3] (Doc. 161,
Attach. 2 at ¶ 1; Doc. 218, Attach. 1 at ¶ 6; Doc. 161, Attach.
3 at 55.) Ms. Storey called 911 and drove to her father's home.
(Doc. 161, Attach. 2 at ¶ 2; Doc. 218, Attach. 1 at ¶ 7.) Two

---

[2] The relevant facts are taken principally from the parties'
statements of undisputed material facts. (Doc. 161, Attach. 2;
Doc. 218, Attach. 1.) Pursuant to Federal Rule of Civil
Procedure 56(e) and Southern District of Georgia Local Rule
56.1, all material facts not controverted by specific citation
to the record are deemed admitted, unless otherwise
inappropriate. The Court notes that Plaintiff fails to respond
to many of the facts included in the ECSO Officers' statement of
material facts. Accordingly, the Court deems the facts included
in the ECSO Officers' statement of material facts admitted
except where Plaintiff clearly disputes these facts. Where
Plaintiff does offer conflicting accounts of the events in
question, this Court draws all inferences and presents all
evidence in the light most favorable to the nonmoving party—
Plaintiff. See Hamilton v. Southland Christian Sch., Inc., 680
F.3d 1316, 1318 (11th Cir. 2012) (citing Moton v. Cowart, 631
F.3d 1337, 1341 (11th Cir. 2011)).
[3] In their respective statements of material facts, both parties
claim that the call took place "[e]arly in the morning on Sunday
September 9, 2012." (Doc. 161, Attach. 2 at ¶ 1; Doc. 218,
Attach. 1 at ¶ 6.) However, in Valerie Storey's deposition that
both parties cite, Ms. Storey states that the call took place
"late at night, approximately 10:00." (Doc. 161, Attach. 3 at
55.) This discrepancy does not affect the Court's analysis.

police officers and Jonathan Williams, a family friend, were with Cartee when Ms. Storey arrived. (Doc. 161, Attach. 3 at 56.) The officers attempted to persuade Cartee to be sent for a mental evaluation, but Cartee refused. (Id. at 58.) The police officers spoke to Cartee "for a very long time," but eventually the officers left the scene for their shift change. (Id. at 56-57.) Ms. Storey and Mr. Williams remained with Cartee after the officers left. (Id. at 58-59.) While Ms. Storey was attempting to calm her father, Cartee put a knife to her throat and said, "if I'm going to go, you're going to go." (Doc. 161, Attach. 2 at ¶ 3; Doc. 218, Attach. 1 at ¶ 7.) Mr. Williams was able to get Ms. Storey away from Cartee, and the two drove to a neighbor's house to call 911 again. (Doc. 161, Attach. 3 at 60.)

An officer of the Effingham County Sheriff's Office ("ECSO"), Sergeant Bryan Shearouse, responded to the scene at approximately 5:00 a.m. and was apprised that Cartee appeared to be suicidal. (Doc. 161, Attach. 2 at ¶ 4; Doc. 218, Attach. 1 at ¶ 8; Doc. 161, Attach. 4 at 41-42.) Sgt. Shearouse and a Deputy Shaffer made conversation with Cartee. (Doc. 161, Attach. 4 at 45.) When asked if he was suicidal, Cartee would respond, "It doesn't matter." (Id.) At some point, Cartee handed Sgt. Shearouse a bottle containing different pills but refused to answer whether he had taken any pills. (Id. at 47.) Based on Cartee's behavior and the concern that he would harm himself or

others, Sgt. Shearouse decided to call an ambulance and have Cartee checked out by EMT. (Id. at 85-86.) Eventually, Cartee agreed to have EMT transport him to Effingham Hospital for a voluntary mental health evaluation. (Id. at 86.)

Cartee was transported to the hospital by ambulance, with Sgt. Shearouse following in his police cruiser. (Doc. 161, Attach. 2 at ¶ 7; Doc. 218, Attach. 1 at ¶ 11.) While in transit, Cartee attempted to escape from the ambulance. (Doc. 161, Attach. 2 at ¶ 8; Doc. 218, Attach. 1 at ¶ 12.) The ambulance stopped, and Sgt. Shearouse took Cartee into custody as he had determined that Cartee was a danger to himself and others and needed to be taken for an involuntary evaluation. (Doc. 161, Attach. 2 at ¶ 9; Doc. 218, Attach. 1 at ¶ 13; Doc. 161, Attach. 4 at 88.) Sgt. Shearouse then transported Cartee to Effingham Hospital in his police cruiser. (Doc. 161, Attach. 2 at ¶ 9; Doc. 218, Attach. 1 at ¶ 13).

Upon their arrival at Effingham Hospital, a nurse informed Sgt. Shearouse that she would need a urine sample from Cartee and asked that one of Cartee's handcuffs be removed so that he could provide the sample. (Doc. 161, Attach. 2 at ¶ 10.) Sgt. Shearouse removed Cartee's left handcuff. (Id. at ¶ 11.) Cartee then began walking towards Sgt. Shearouse while pulling on his zipper in a manner that caused Sgt. Shearouse to believe Cartee intended to urinate on him. (Id. at ¶ 12.) Sgt. Shearouse

4

instructed Cartee not to come any closer, but Cartee ignored the directive and raised a closed fist at Sgt. Shearouse. (Id. at ¶¶ 13-15.) Fearing that Cartee would hit him, Sgt. Shearouse pushed Cartee against the wall to immobilize him. (Id. at ¶ 16.) Cartee then tried to hit Sgt. Shearouse with his left arm, and Sgt. Shearouse loudly commanded Cartee to stop resisting. (Id. ¶ 17.) Sgt. Shearouse was eventually able to force Cartee to the ground. (Id. at ¶ 18.) Cartee continued to resist despite Sgt. Shearouse's instructions and attempts to restrain Cartee. (Id. at ¶ 19.)

Because Cartee refused to comply, Sgt. Shearouse pulled out his Taser and threatened to tase Cartee. (Doc. 161, Attach. 1 at ¶ 20; Doc. 218, Attach. 1 at ¶ 15.) The threat of the Taser caused Cartee to cease resisting momentarily; however, when Sgt. Shearouse attempted to handcuff him, Cartee once again resisted. (Doc. 161, Attach. 2 at ¶¶ 21-22.) Sgt. Shearouse then placed his knee between Cartee's shoulder and neck to "garner a pain response" in order to get both of Cartee's hands behind his back and cuffed. (Id. at ¶ 23.) At this point, Sgt. Shearouse was able to stand up Cartee, and Cartee generally ceased resisting. (Id. at ¶ 24.) Cartee suffered a minor skin tear to his right wrist during the altercation, and the wound was checked and cleaned by a doctor at the hospital. (Id. at ¶ 25.) Following the altercation, the hospital staff medically cleared Cartee for

release. (Id. at ¶ 27.) Sgt. Shearouse arrested Cartee for
felony obstruction and transported him to Effingham County Jail
at approximately 11:45 a.m. on September 9, 2012. (Id.)

## II.   CARTEE'S FIRST STAY AT EFFINGHAM COUNTY JAIL

At the jail, Sergeant Leslie Minor heard Cartee "hollering
and cussing" over the dispatch radio as Sgt. Shearouse
transported him to the jail. (Doc. 161, Attach. 2 at ¶ 28.) Sgt.
Minor notified Officers Dorothy Hopf, Paul Davis, and John
Reinhart that Cartee had been "fighting deputies" and instructed
them to assist Sgt. Shearouse with bringing Cartee into the
jail. (Id. at ¶ 29.) Based on her knowledge that Cartee had
already been combative, Sgt. Minor instructed Officer Davis to
get a Taser. (Id. at ¶ 30.)

Cartee was reportedly "out of control" when he entered the
jail's booking area, screaming and referring to Sgt. Minor with
a racial epithet. (Id. at ¶ 31.) Officers Reinhart and Hopf
removed the handcuffs from Cartee and instructed him to place
his hands flat down on the booking desk. (Id. at ¶ 32.) At this
point, Sgt. Shearouse left the booking area to disinfect his
handcuffs but was able to observe Cartee failing to follow the
jail officers' commands from the doorway of the adjacent room.
(Id. at ¶¶ 33-34.) Cartee refused jail officers' commands to
spread his feet; and when the officers attempted to put Cartee's
hands on the table and told Cartee to keep them there, Cartee

"snatched them away" and told the officers, "I know what I'm doing." (Id. at ¶¶ 35, 37.)

Plaintiff claims that at no point during this altercation did Cartee attempt to assault an officer. (Doc. 218, Attach. 1 at ¶ 25.) According to Sgt. Minor, however, whenever an officer attempted to restrain Cartee, he would swing his arms wildly and at one point almost hit Officer Reinhart in the face. (Doc. 161, Attach. 5 at 233-34.) Because other officers were unable to restrain Cartee, Cartee was refusing the officers' commands, and Cartee had already fought Sgt. Shearouse at the hospital, Officer Davis deployed his Taser's prongs towards Cartee, which attached to his abdominal area. (Doc. 161, Attach. 2 at ¶ 41; Doc. 161, Attach. 7 at 10.) The shock from the taser caused Cartee to fall onto Officer Reinhart, and they in turn fell together onto a row of plastic chairs. (Doc. 161, Attach. 2 at ¶¶ 42-43.)

The officers then gained control over Cartee, removed the Taser prongs, and placed Cartee in a restraint chair in a holding cell to give him time to calm down. (Id. at ¶ 44.) Sgt. Minor called the on-call telephone number for the jail's contracted medical provider, TransformHealthRX ("THRX"), and requested that a nurse come to the jail to examine Mr. Cartee. (Id. at ¶ 46.) Nurse Marilyn Spikes arrived soon thereafter, but Cartee refused to allow her to examine him. (Id. at ¶ 47.)

Officer Reinhart and Sgt. Minor removed Cartee from the restraint chair later that day, around 1:45 p.m.[4] (Doc. 161, Attach. 6 at 59.) According to Officer Reinhart, Cartee appeared normal and did not complain of injuries at this time. (Id. at 60.) Cartee's combative behavior continued through Monday, September 10, 2012, and, as a result, jail staff were unable to fully book him into the jail. (Doc. 161, Attach. 2 at ¶ 49.)

At approximately 6:00 p.m. Monday, September 10, 2012, Nurse Rebecca Ransom, THRX's weekday nurse, assessed Cartee. (Doc. 161, Attach. 2 at ¶ 51.) Cartee indicated that he had previously taken illicit drugs, and Nurse Ransom concluded that his behavior was possibly drug-induced as opposed to the product of mental illness. (Id. at ¶ 52.) After consulting with a supervisor, Nurse Ransom obtained an order to send Cartee back to Effingham Hospital for a mental health evaluation. (Id. at ¶ 53.)

---

[4] Plaintiff alleges that Cartee was left strapped naked to the restraint chair from when he was first placed in the holding cell on September 9, 2012, until 6:00 p.m. Monday, September 10, 2012, when he was examined by Nurse Rebecca Ransom. (Doc. 218, Attach. 1 at ¶ 28.) In support of this allegation, Plaintiff cites to a message sent by Megan Miley, a THRX nurse, on September 10, 2012. (Doc. 161, Attach. 10 at 314.) The message states that "[Cartee] has been combative all day with officers and they have been unable to book. Inmate was placed in the restraint chair[,] and Nurse Rebecca was sent back to evaluate[] inmate." (Id.) This message does not rebut Reinhart's testimony that Cartee was removed from the restraint chair on September 9, 2012. Rather, it merely shows that officers were forced to place Cartee back in the restraint chair on September 10, 2012, due to Cartee's continued aggressive behavior.

Patrol Officer Ashby Zydonyk was instructed to transport Cartee back to Effingham Hospital. (Id. at ¶ 55.) Officer Zydonyk arrived at the holding cell and found Cartee alone and secured in a restraint chair. (Id. at ¶ 56.) Officers Zydonyk and Reinhart entered the cell together to remove Cartee from the chair. (Id. at ¶ 57.) Officer Zydonyk removed the nylon straps that secured Cartee to the chair and asked Cartee to stand up several times. (Id. at ¶ 60.) Cartee refused to stand up voluntarily, so Officer Zydonyk took hold of Cartee's arm to lift him to his feet. (Id. at ¶ 61.) At this time, Cartee became combative, pulling away and failing his arms in a manner consistent with the previous incidents. (Id. at ¶ 62.) Officer Zydonyk immediately took Cartee to the ground to gain control of the situation, but Cartee continued to resist. (Id. at ¶¶ 63-64.) With the help of Officer Garett Buckles, the officers were able to secure handcuffs and leg irons on Cartee and lift him to his feet, but Cartee continued to struggle and resist the officers' efforts to remove him from the holding cell. (Id. at ¶¶ 65-69.) According to Officer Reinhart, "[t]he officers had [Cartee] by each arm, and he'd pick his legs up and try to push us away or push against a wall, actually resisting [sic] not trying to get out of the holding cell." (Doc. 161, Attach. 6 at 74.) In order get Cartee to stop resisting, Officer Reinhart

applied the Taser in drive-stun[5] mode to Cartee's hip.[6] (Id. at 74.)

The officers were then able to get Cartee out of the holding cell and into the booking area. (Doc. 161, Attach. 2 at ¶ 72.) Cartee began resisting again and refused to walk, so the officers carried him out of the jail to the jail's transport vehicle. (Id. at ¶¶ 72, 74.) Officer Zydonyk then placed Cartee in the transport vehicle and drove him to the hospital along with Officer Reinhart. (Id. at ¶ 74.)

## III. CARTEE IS TREATED AT GEORGIA REGIONAL FOR MENTAL ILLNESS

At approximately 7:00 p.m. on September 10, 2012, officers carried Cartee into the emergency room of Effingham Hospital, where hospital staff gave Cartee multiple sedative injections to control his disorderly behavior. (Id. at ¶ 77.) Cartee remained at Effingham Hospital until 3:00 a.m. on September 11, 2012, when, in accordance with a physician's orders, Officer Zydonyk

---

[5] Drive-stun mode allows a Taser to be used like a stun gun—meaning the Taser is pressed directly against the skin and produces a burning sensation. (Doc. 161, Attach. 2 at ¶ 70 n.1 (citing Mingo v. City of Mobile, Ala., 592 F. App'x 793, 796 n.1 (11th Cir. 2014) (per curiam)).)

[6] The officers' accounts differ on whether Officer Reinhart used the Taser on Cartee while Cartee was still on the ground or after he had been lifted to his feet. (Doc. 161, Attach. 2 at ¶ 70 n.2; Doc. 218, Attach. 1 at ¶ 39.) As Plaintiff asserted, the Court will construe this fact in the light most favorable to Plaintiff and assume Cartee was still on the ground at the time Officer Reinhart used the Taser on him.

transported Cartee to Georgia Regional Hospital to receive mental health care. (Id. at ¶ 78.)

Cartee was hospitalized at Georgia Regional from September 11, 2012, until September 17, 2012. (Id. at ¶ 79.) At Georgia Regional, Cartee began to display signs that he was suffering from at least partial paralysis. (Id. at ¶ 81.) For example, on September 13, 2012, a social worker met with Cartee and found him using a wheelchair because, according to Cartee, he could not walk. (Id. at ¶ 81.) According to Cartee's Georgia Regional records, Cartee was initially disorderly but "[o]ver the course of his stay he did not present as an imminent danger to himself or others." (Doc. 161, Attach. 14 at 57.) "By [September 17, 2012,] he was felt appropriate to discharge back to the jail." (Id.)

## IV. CARTEE'S SECOND STAY AT EFFINGHAM COUNTY JAIL

When Deputy Robert Plank arrived at Georgia Regional to transport Cartee back to the jail at 11:00 a.m. on September 17, 2012, a nurse informed Deputy Plank that Cartee had times where he could not walk and times that he would walk. (Doc. 161, Attach. 2 at ¶ 83.) Deputy Plank asked the nurse whether a wheelchair was necessary to move Cartee to the transport vehicle, and the nurse replied, "No. He's walking." (Id. at ¶ 84.) With handcuffs and leg irons applied, Cartee walked approximately 35-40 feet from the Georgia Regional facility to

Deputy Plank's vehicle in the parking lot. (Id. at ¶ 85.) On the ride back to the jail, Cartee informed Deputy Plank that he was "not getting out of this car." (Id. at ¶ 86.) Deputy Plank radioed the jail for assistance and with the help of Officers Davis and Reinhart, the officers were able to get Cartee out of the car and into the jail. (Id. at ¶¶ 87-89.)

Later on September 17, 2012, Nurse Ransom conducted an intake exam of Cartee but did not roll up the sleeves of Cartee's jail uniform.[7] (Id. at ¶¶ 90-91.) The next day at approximately 10:00 a.m., Cartee was examined by THRX's Licensed Professional Counselor, Anisa Grantham. (Id. at ¶ 92.) Although Cartee told Grantham, "I can't walk," Grantham observed Cartee bending his knees to sit on the side of the bunk and was "not convinced [Cartee could] not walk." (Doc. 161, Attach. 9 at 8.)

Later in the day on September 18, 2012, Officer Davis was instructed to escort Cartee from the isolation cell to the booking area for his bond hearing. (Doc. 161, Attach. 2 at ¶ 94.) When Officer Davis informed Cartee that he was needed in

---

[7] The note from Nurse Ransom's September 17, 2012, exam describes Nurse Ransom's observations as follows:

> [Cartee] was ambulatory upon leaving [the jail] and returned stating he could not walk. No obvious trauma to legs. Observed inmate bending and moving both legs. Also witnessed [Cartee] standing at door in booking area upon return from GA regional. Deputy Plank, who transported [Cartee] from GA regional, states that he observed inmate walking at GA regional before pick up.

(Doc. 161, Attach. 9 at 7.)

the booking area, Cartee stood up, but told Officer Davis that he could not walk. (Id. at ¶¶ 96-97.) Officer Davis spent approximately five minutes unsuccessfully instructing Cartee to walk and reminding Cartee that he had seen Cartee walk the previous day. (Id. at ¶ 98.) Officer Davis then went to the booking area to inform Captain Robert Brown of Cartee's refusal, and Captain Brown instructed Officer Davis to use the tools available to him. (Id. at ¶ 99.)

Officer Davis returned to Cartee's isolation cell with a Taser and announced, "Mr. Cartee, we need to escort you to booking, or I'm going to have to tase you." (Doc. 161, Attach. 2 at ¶ 100; Doc. 161, Attach. 7 at 21.) When Cartee still would not walk, Officer Davis applied the Taser in drive-stun mode onto Cartee's lower thigh. (Doc. 161, Attach. 2 at ¶ 102.) Officer Reinhart was standing just inside the door of the isolation cell when Officer Davis used the Taser on Cartee. (Id. at ¶ 101.) According to Officer Reinhart, when Officer Davis used the Taser on Carter, his "legs would move, he would squirm," making Officer Reinhart believe Cartee's legs were operable. (Doc. 161, Attach. 6 at 106.) After Cartee was initially stunned, he pulled away and attempted to grab the Taser. (Doc. 161, Attach. 2 at ¶ 103.) Officer Davis attempted to drive stun Cartee two additional times but was unsure whether he made contact with Cartee's thigh. (Id. at ¶ 104.) Officer

Tiffany Tisby then retrieved a wheelchair which was used to escort Cartee to the booking area without further incident. (Id. at ¶ 106.)

On September 20, 2012, jail officers informed Sergeant Latonya Cooper that they were having to assist Cartee in using the toilet because Cartee was complaining that he could not walk. (Id. at ¶ 107.) Sgt. Cooper went to check on Cartee herself, and Cartee told Sgt. Cooper that he was unable to walk. (Id. at ¶¶ 108-109.) After Sgt. Cooper discussed the situation with Nurse Ransom, the decision was made to transport Cartee back to Effingham Hospital. (Id. at ¶ 110.) Sgt. Cooper transported Cartee to Effingham Hospital at approximately 10:00 a.m. on September 20, 2012. (Id. at ¶ 111.)

While at Effingham Hospital, Sgt. Cooper learned that Cartee had been diagnosed with renal failure. (Id. at ¶ 112.) Cartee was released from custody on his own recognizance later that day. (Id. at ¶ 113.) After his release from custody, Cartee was taken to Memorial Hospital, where he was diagnosed with a cervical spinal cord injury and T11 vertebral fracture which caused partial paralysis. (Id. at ¶ 115.) Cartee was also diagnosed with several broken ribs, sepsis, and severe dehydration.[8] (Doc. 218, Attach. 1 at ¶ 58.) Cartee remained at

---

[8] The Court notes that the parties have not provided Cartee's medical records from Memorial Hospital that would show his exact

Memorial Hospital until October 22, 2012, when he was transferred to Woodlands Healthcare and Rehabilitation Center ("Woodlands"), an extended care facility. (Doc. 72 at 21.) Cartee was discharged from Woodlands on April 23, 2013, with hospice services. (Id. at 33.) Cartee died at home on June 25, 2013, from cardiopulmonary arrest, respiratory failure, and adult failure to thrive. (Id.)

## V.   PROCEDURAL HISTORY

On September 8, 2014, Valerie Storey,[9] individually and as executrix of Cartee's estate, filed a civil rights and tort action against Effingham County Jail, Jimmy McDuffie, Effingham County Sheriff's Department, TransformHealthRX, Inc., Effingham County Board of Commissioners, and 35 John and Jane Does. Storey v. Effingham Cnty. Jail, No. 4:14-cv-194-WTM, (Doc. 1 at 1), (S.D. Ga. Sept. 8, 2014). On November 26, 2014, the Court dismissed the action without prejudice pursuant to Federal Rule

---

diagnosis. Instead, Plaintiff cites to the deposition of their expert witness, Inna Sheyner, M.D., who testified to his review of Cartee's medical history prior to his transfer from Memorial Hospital but does not state when Cartee's conditions were diagnosed. (Doc. 218, Attach. 1 at ¶¶ 88-90; citing Doc. 218, Attach. 22 at 25.) However, because the ECSO Officers have not objected to this fact, the Court will assume for purposes of this order that Cartee was diagnosed with these conditions at Memorial Hospital on September 20, 2012.

[9] Valerie Storey is Cartee's biological daughter. However, William Lamar Newman adopted Ms. Storey in 1981 after marrying Estella Nelson, Ms. Storey's mother. (Doc. 157, Attach. 1 at 5; Doc. 202, Attach. 1 at 3.) Cartee's parental rights over Ms. Storey were terminated during this adoption. (Doc. 157, Attach. 1 at 5.)

of Civil Procedure 41(a)(1)(A)(ii). <u>Storey v. Effingham Cnty.
Jail</u>, (Doc. 32 at 1), (S.D. Ga. Nov. 26, 2014).

On May 20, 2015, Ms. Storey, individually and as executrix
of Cartee's estate, filed this renewal action alleging multiple
federal and state law causes of actions against several
individuals and entities involved in Cartee's incarceration and
medical treatment. (Doc. 1.) This complaint named the ECSO
Officers as defendants for the first time. (<u>Id.</u>) Relevant to
this motion, in the Second Amended Complaint, Ms. Storey alleged
two causes of action against the ECSO Officers in their official
and individual capacities. (Doc. 72.) Count 1 alleged a 42
U.S.C. § 1983 claim against the ECSO Officers for their alleged
deliberate indifference to Cartee's medical needs while
incarcerated.[10] (<u>Id.</u> at 22-25.) Count 2 alleged that the ECSO
Officers violated Georgia law through their failure to provide
Cartee with adequate medical care and tortious use of force.
(<u>Id.</u> at 25-30.) Based on these causes of action, Ms. Storey
alleged damages in her capacity as the executrix of Cartee's
estate for Cartee's pain and suffering during life. (<u>Id.</u> at 29-
30, 45.) Ms. Storey also brought wrongful death claims for
damages. (<u>Id.</u> at 45.) Following Ms. Storey's death, her husband,

---

[10] To the extent that the Second Amended Complaint could be
construed to assert a claim for excessive force under § 1983,
Plaintiff concedes in his responsive brief that he is not
asserting such a claim in this action. (Doc. 218, Attach. 2 at
1.)

Keith Storey, was substituted as the party plaintiff in this case. (Doc. 137.) Now, the ECSO Officers move jointly for summary judgment on Plaintiff's claims against them. (Doc. 161.)

### STANDARD OF REVIEW

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial[.]' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines which facts are material. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989)

(citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex</u>, 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotation marks omitted). The burden then shifts to the nonmoving party to establish, by going beyond the pleadings, that there is a genuine issue concerning facts material to its case. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. <u>Matsushita</u>, 475 U.S. at 587-88, 106 S. Ct. at 1356 (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962)). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> at 586, 106 S. Ct. at 1356 (citations omitted). A mere "scintilla" of evidence or simply conclusory allegations will not suffice. <u>See, e.g.</u>, <u>Tidwell v. Carter Prods.</u>, 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference

creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citing Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

### ANALYSIS

The ECSO Officers contend they are entitled to summary judgment on all of Plaintiff's claims against them. (Doc. 161.) First, the ECSO Officers argue they are entitled to summary judgment on Plaintiff's wrongful death claims because Ms. Storey, whom Plaintiff replaced, had no right to bring wrongful death claims in her individual capacity since she was not Cartee's legal daughter. (Doc. 161, Attach. 1 at 1 n.1.)[11] Next, the ECSO Officers argue the statute of limitations bars all claims alleged against them because they were not named as defendants in the original action. (Id. at 2.) Finally, the ECSO Officers argue they are entitled summary judgment on the merits of each of Plaintiff's claims because (1) qualified immunity bars Plaintiff's § 1983 claim against the ECSO Officers in their individual capacities, (2) Plaintiff has not established the necessary elements of his § 1983 official capacity claims against the ECSO Officers, (3) sovereign immunity bars

---

[11] In making this argument, the ECSO Officers adopt and incorporate the argument Dr. Ali Rahimi makes in his brief in support of his summary judgment motion. (Doc. 157, Attach. 2 at 4-7.)

Plaintiff's state law claims against the ECSO Officers in their official capacities, and (4) official immunity bars Plaintiff's state law claims against the ECSO officers in their individual capacities. (Id. at 2-3.)

In response, Plaintiff states that he is no longer asserting state law claims against the ECSO Officers in their official capacities. (Doc. 218, Attach. 2 at 3.) Accordingly, the Court **GRANTS** summary judgment for the ECSO Officers on these claims. See Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citation omitted)). However, Plaintiff disputes that the statute of limitations bars his § 1983 claims. (Doc. 218, Attach. 2 at 4.) Plaintiff also opposes summary judgment on the merits of his § 1983 and state law claims against the ECSO Officers. (Id.) As discussed below, the Court finds that the ECSO Officers are entitled to summary judgment on the merits of all of Plaintiff's claims.[12]

## I.   PLAINTIFF'S WRONGFUL DEATH CLAIMS

The Court will first address whether Plaintiff's wrongful death claims are invalid because Ms. Storey lacked authority to pursue the claims in her individual capacity. The ECSO Officers

---

[12] For the purposes of this order, the Court does not reach the issues of whether Plaintiff's claims are barred by the statute of limitations.

argue that Ms. Storey, and Plaintiff by proxy, lacked standing to bring wrongful death claims in her individual capacity because she was adopted by her stepfather and was therefore no longer Cartee's legal kin. (Doc. 161, Attach. 1 at 1 n.1; Doc. 157, Attach. 2 at 3-6.) The ECSO Officers also argue that although Ms. Storey could have brought the wrongful death claims in her capacity as executrix of Cartee's estate, she did not. (Doc. 157, Attach. 2 at 6.) Plaintiff did not discuss this issue in his brief opposing the ECSO Officers' motion for summary judgment.[13] Yet, in ruling on this issue, the Court has considered Plaintiff's response to Dr. Ali Rahimi's motion for summary judgment, in which Plaintiff argues that stepparent adoptions do not sever a child's right to bring a wrongful death claim. (Doc. 202, Attach. 2 at 14-20.)

---

[13] Plaintiff failed to respond directly to several of the arguments the ECSO Officers raised in support of summary judgment. It is not the Court's responsibility to invent arguments on Plaintiff's behalf or to address every potential argument Plaintiff could have, but did not, make based on the evidence in the record. See Resol. Tr. Corp., 43 F.3d at 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment[ ] . . . . Rather, the onus is upon the parties to formulate arguments[.]" (citations omitted)); see also A.L. v. Jackson Cnty. Sch. Bd., 635 F. App'x 774, 786 (11th Cir. 2015) (per curiam) ("[D]istrict courts are not required to 'mine' the record looking for evidence not presented by the parties." (citing Chaves v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1061 (11th Cir. 2011)).

In Georgia, wrongful death claims did not exist at common law but were statutorily created through the enactment of the Wrongful Death Act. Tolbert v. Maner, 271 Ga. 207, 208, 518 S.E.2d 423, 425 (1999) (citing O.C.G.A. § 51-4-1 et seq.). "Being in derogation of common law, the scope of the Wrongful Death Act must be limited in strict accordance with the statutory language used therein, and such language can never be extended beyond its plain and ordinary meaning." Id. (citation omitted). Additionally, the Eleventh Circuit has held that a Plaintiff's ability to bring a § 1983 claim for wrongful death is governed by the Georgia Wrongful Death Act. Carringer v. Rodgers, 331 F.3d 844, 850 (11th Cir. 2003) (per curiam) ("Georgia's wrongful death statute is incorporated into federal law under [42 U.S.C.] § 1988." (citations omitted)); Brazier v. Cherry, 293 F.2d 401, 409 (5th Cir. 1961)[14] (holding state law governed Georgia plaintiff's civil rights tort). Therefore, Georgia law governs whether Plaintiff has standing to seek wrongful death damages based on his federal and state law claims.

---

[14] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The Wrongful Death Act outlines the potential persons entitled to bring an action for wrongful death. O.C.G.A. § 51-4-2(a) provides:

> The surviving spouse or, if there is no surviving spouse, a child or children, either minor or sui juris, may recover for the homicide[15] of the spouse or parent the full value of the life of the decedent, as shown by the evidence.

In cases when there is no other person entitled to bring an action for the wrongful death, "the administrator or executor of the decedent may bring an action for and may recover and hold the amount recovered for the benefit of the next of kin." O.C.G.A. § 51-4-5(a).

Because no one contends that Cartee had a surviving spouse at the time of his death, the first person with priority to bring a wrongful death claim on his behalf would be a surviving child. O.C.G.A. § 51-4-2(a). However, Georgia courts have held that adoption severs the right of a natural child to bring a wrongful death action on behalf of their natural parent. See Eig v. Savage, 177 Ga. App. 514, 514-15, 339 S.E.2d 752, 753 (1986); Johnson v. Parrish, 159 Ga. App. 613, 613, 284 S.E.2d 111, 113 (1981) (finding plaintiff lacked standing to bring wrongful death action because "[t]he adopted individual is no longer the

---

[15] In the context of the Wrongful Death Act, " 'Homicide' includes all cases in which the death of a human being results from a crime, from criminal or other negligence, or from property which has been defectively manufactured, whether or not as a result of negligence." O.C.G.A. § 51-4-1(2).

decedent's legal child."). Although Plaintiff argues that adoption by a stepparent should be treated differently, the Court finds no support for this position in Georgia law.[16] Because Ms. Storey was adopted prior to Cartee's death, the Court agrees that she lacked standing to bring a wrongful death claim in her individual capacity as his child, and therefore, Plaintiff lacks standing to bring a wrongful death claim in his capacity as administrator of her estate. See Johnson, 159 Ga. App. at 613, 284 S.E.2d at 113.

Nevertheless, the Court finds that Plaintiff still has standing to pursue a wrongful death claim in his capacity as administrator of Cartee's estate. O.C.G.A. § 51-4-5(a) makes clear that if the decedent has no surviving spouse or children, the correct party to bring a wrongful death claim is the administrator or executor of the decedent's estate, which initially was Ms. Storey and is now Plaintiff. In this case, Ms. Storey brought her claims individually and as executrix of the estate of Cartee, and she did not state explicitly whether her wrongful death claims were brought only in one of those capacities. (Doc. 72 at 1-2) Therefore, the Court finds that the

---

[16] Plaintiff argues that O.C.G.A. § 19-8-19(a)(1) excepts stepparent adoption from the general rule that adoption severs the legal relationship between a child and their natural parent. (Doc. 202, Attach. 2 at 15-17.) On the contrary, O.C.G.A. § 19-8-19(a)(1) only excepts the "spouse of the petitioner and relatives of the spouse," which would not include a natural parent not married to the adopting parent.

appropriate action is to **DISMISS** the wrongful death claims Ms. Storey brought in her individual capacity, which Plaintiff now brings in his capacity as executor of Ms. Storey's estate. The Court finds, however, that Plaintiff does have standing to pursue the wrongful death claims in his capacity as executor of Cartee's estate, and the Court will address the merits of those claims along with Plaintiff's survival claims below.

II.   PLAINTIFF'S OFFICIAL CAPACITY § 1983 CLAIMS

When a plaintiff brings a § 1983 action against a local government official in his or her official capacity, "the suit is simply another way of pleading an action against an entity of which an officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (internal quotation marks omitted) (citing Kentucky v. Graham, 473 U.S. 161, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)). In this case, Plaintiff's official capacity claims against the ECSO Officers are essentially the same as his official capacity claims against Defendants Jimmy McDuffie and Effingham County. Id. The Court previously granted summary judgment to those Defendants because Plaintiff failed to establish a basis for entity liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). (Doc. 254 at 27.) For the same reasons set forth in that order, the Court finds that Plaintiff's § 1983 claims against the ECSO Officers in their

official capacities fail as a matter of law because Plaintiff failed to establish the existence of an unconstitutional policy on the part of the sheriff's office or Effingham County.[17] Accordingly, the ECSO Officers' motion for summary judgment is **GRANTED** to the extent they request dismissal of Plaintiff's official capacity § 1983 claims.

III. <u>PLAINTIFF'S INDIVIDUAL CAPACITY § 1983 CLAIMS</u>

The Court will now turn to Plaintiff's § 1983 claims against the ECSO Officers based on their alleged deliberate indifference to Cartee's medical care. The ECSO Officers contend that they are entitled to qualified immunity on these claims. (Doc. 161, Attach. 1 at 18-19.) Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Id.</u> (quotations omitted). If a government official is sued in his individual capacity for performing a discretionary function, qualified immunity protects the official from civil liability

---

[17] As the Court explained in its previous order, the ECSO Officers are entitled to summary judgment on Plaintiff's official capacity claims whether they are treated as agents of the State or Effingham County because Plaintiff "has failed to point to any unconstitutional policy or custom of the County or the State that caused his injuries." (Doc. 254 at 23.)

unless his actions violated clearly established law. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).

Because it is undisputed that the ECSO Officers acted within their discretionary authority,[18] Plaintiff "bear[s] the burden 'to establish that [the ECSO Officers] violated [his] constitutional rights[] . . . and that the right involved was "clearly established" at the time of the time of the putative misconduct.' " Leslie v. Hancock Cnty. Bd. of Educ., 720 F.3d 1338, 1345 (11th Cir. 2013) (quoting Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012)). Accordingly, the Court will first consider whether Plaintiff has established that the ECSO

---

[18] As the ECSO Officers highlighted in their brief, well established precedent supports a finding that the ECSO Officers acted within their discretionary authority when providing medical services to Cartee. (Doc. 161, Attach. 1 at 19 (collecting cases)). While Plaintiff argues that the ECSO Officers' actions should be considered non-discretionary for the purposes of their official immunity defense to his state law claims, Plaintiff fails to address the discretionary authority issue when responding to the ECSO Officers' qualified immunity defense. (See generally Doc. 218, Attach. 2 at 9–11, 18–19.) The question of whether the nature of an official's actions entitle them to raise the defense of qualified immunity is fundamentally distinct from the official immunity analysis. See McDaniel v. Yearwood, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *13 n.13 (N.D. Ga. Feb. 16, 2012) (explaining qualified immunity inquiry "is separate and distinct from the question of whether an act is classified as 'discretionary' or 'ministerial' for purposes of official immunity under state law"). Therefore, the Court does not find that Plaintiff has meaningfully disputed whether the ECSO Officers acted within their discretionary authority and are entitled to raise a qualified immunity defense.

Officers' conduct constituted a violation of Cartee's constitutional rights.

A pretrial detainee, like Cartee was, has a right to adequate medical care under the due process clause of the Fourteenth Amendment. Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015). "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the [Fourteenth] Amendment."[19] Marsh v. Butler Cnty., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (citation omitted), abrogated in part on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63, 127 S. Ct. 1955, 1968-69, 167 L. Ed. 2d 929 (2007). To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pretrial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009) (citation omitted). At issue in this case is whether Plaintiff has satisfied the second element—that the ECSO Officers were deliberately indifferent to Plaintiff's serious

---

[19] See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (explaining Fourteenth Amendment governs pretrial detainee deliberate indifference claims but that the standards under the Fourteenth Amendment are identical to those under the Eighth).

medical need.[20] The Eleventh Circuit has described the inquiry
for the deliberate indifference element as follows:

> The second element—the defendant's deliberate
> indifference to that risk—has two components: one
> subjective and one objective. To satisfy the
> subjective component, a plaintiff must produce
> evidence that the defendant actually (subjectively)
> kn[ew] that an inmate [faced] a substantial risk of
> serious harm. To satisfy the objective component, a
> plaintiff must produce evidence that the defendant
> disregard[ed] that known risk by failing to respond to
> it in an (objectively) reasonable manner.
>
> With regard to the subjective component of the second
> element—i.e., the defendant's actual knowledge that an
> inmate faced a substantial risk of serious harm—the
> defendant must both be aware of facts from which the
> inference could be drawn that a substantial risk of
> serious harm exists, and he must also draw the
> inference. Whether a prison official had the requisite
> knowledge of a substantial risk is a question of fact
> subject to demonstration in the usual ways, including
> inference from circumstantial evidence.

Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099-1000
(11th Cir. 2014) (internal citations and quotation marks
omitted) (alterations in original).

Here, the ECSO Officers contend that Plaintiff failed to
establish deliberate indifference because there is no evidence
that any ECSO Officer had knowledge of Cartee's serious medical
need. (Doc. 161, Attach. 1 at 20-21.) Additionally, the ECSO
Officers argue that Cartee was under the care of THRX medical
providers during his period of incarceration and there is no

---

[20] In their brief, the ECSO Officers make no argument about
whether Cartee's conditions constituted a serious medical need.

evidence that the ECSO Officers ever prevented or hindered THRX providers in their treatment of Cartee. (Id. at 20-21.) In response, Plaintiff fails to point to any specific facts which show an ECSO Officer was aware of Cartee's serious medical need. (See generally Doc. 218 at 11-16.) Instead, Plaintiff appears to argue that the ECSO Officers' complete denial of medical treatment for Cartee is enough to demonstrate deliberate indifference. (Id. at 13.) After careful review of the record, the Court finds Plaintiff has not established that any of the ECSO Officers were subjectively aware of Cartee's serious medical needs while he was incarcerated or that they responded unreasonably to any medical need of which they were aware.

Notably, at the time Sgt. Shearouse took Cartee into custody on September 9, 2012, medical personnel at Effingham Hospital had just examined Cartee and cleared him for release. (Doc. 161, Attach. 2 at ¶ 27.) Soon after Cartee arrived at the jail, Sgt. Minor requested Nurse Spikes examine Cartee, but Cartee refused the examination. (Id. at ¶¶ 46-47.) Nurse Ransom examined Cartee the following day and obtained an order to have him sent back to Effingham Hospital for a mental health evaluation. (Id. at ¶ 53.) After being transported from Effingham Hospital, Cartee spent six days under the care of medical providers at Georgia Regional Hospital. (Id. at ¶ 79.) Georgia Regional providers' impression of Cartee's condition

during this period was that he was "appropriate to discharge back to the jail." (Doc. 161, Attach. 14 at 57.) Furthermore, when Cartee returned to the jail, he was examined first by Nurse Ransom on September 17, 2012, and then Nurse Grantham on September 18, 2012. (Doc. 161, Attach. 2 at ¶¶ 90-92.)

As the ECSO Officers argue, nonmedical prison officials are generally entitled to trust that a prisoner is receiving adequate care from the prison's medical providers. Williams v. Limestone Cnty., 198 F. App'x 893, 897-98 (11th Cir. 2006) (holding prison officials "are entitled to rely on medical judgments made by medical professionals responsible for prison care" (citations omitted)); Chambers v. Meeks, No. 2:18-CV-558-SRW, 2021 WL 2926289, at *14 (M.D. Ala. July 12, 2021) (finding no deliberate indifference when plaintiff "failed to present any evidence that . . . defendants knew that the manner in which the jail's medical personnel provided treatment to him created a substantial risk to his health and, with this knowledge, consciously disregarded such risk") (citations omitted). At no point during the time Cartee was incarcerated did medical personnel from the jail or a hospital inform any of the ECSO Officers that Cartee was suffering from a serious medical condition that required immediate treatment. Rather, Cartee was examined multiple times by medical professionals and spent several days in a hospital without any medical professional

discovering the extent of Cartee's condition. Thus, the Court cannot conclude that the ECSO Officers, who are not trained medical professionals, were aware or should have been aware of facts suggesting that a substantial risk of harm existed, especially since there is no evidence that the ECSO Officers were unjustified in relying on the medical providers to capably attend to Cartee's needs. Cf. Davies v. Israel, 342 F. Supp. 3d 1302, 1309 (S.D. Fla. 2018) (denying sheriff's motion to dismiss because plaintiff plausibly alleged that sheriff unjustifiably relied on medical provider whose care had caused multiple deaths at the prison). At most, a few of the ECSO Officers[21] were aware of Cartee's complaints about struggling to walk, but this fact alone does not show that the ECSO Officers understood the extent of Cartee's injury. See Johnson v. Quinones, 145 F.2d 164, 168 (4th Cir. 1998) (explaining that knowledge of symptoms, by itself, is not enough to establish deliberate indifference). Furthermore, considering Cartee's repeated physical outbursts towards the ECSO Officers, during which Cartee often showed use

---

[21] The Court notes that Plaintiff does not allege subjective knowledge on the part of any individual ECSO Officer and appears to argue that they are all collectively liable for Cartee's inadequate medical treatment. (Doc. 218, Attach. 2 at 12-13.) However, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) (first citing Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005); and then citing Whiting v. Marathon Cnty. Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004)).

of his legs, their skepticism about Cartee's complaints is understandable.

The only ECSO Officer who arguably knew that Cartee had a serious medical need was Sgt. Cooper, who was informed by jail officers on September 20, 2022, that Cartee needed assistance to use the toilet. (Doc. 161, Attach. 2 at ¶ 107.) However, after receiving this information, Sgt. Cooper talked to Cartee, discussed the situation with Nurse Ransom, and decided to send Cartee back to Effingham Hospital that same morning. (Id. at ¶¶ 108-111.) Based on this record, the Court concludes that Sgt. Cooper responded reasonably to Cartee's medical needs once she became aware of them.

The cases Plaintiff cites in support of his position all involve visible injuries which would obviously require immediate attention or delays in treatment far greater than what occurred in this case. See, e.g., Valderrama v. Rousseau, 780 F.3d 1108, 1116 (11th Cir. 2015) (finding delay in treatment was deliberate indifference when officers failed to treat gunshot wound of which they were subjectively aware); Duffey v. Bryant, 950 F. Supp. 1168, 1177 (M.D. Ga. 1997) (ruling officers were deliberately indifferent when they failed to check on prisoner or contact doctor despite knowing that prisoner stripped naked in his cell and refused to eat for several days). These cases are clearly distinguishable from the facts at hand because

Cartee's condition was not, at least to a lay person, immediately recognizable, and Cartee was given medical attention several times throughout his incarceration. Because Plaintiff has not established that the ECSO Officers were deliberately indifferent to a serious medical need of which they were aware, the ECSO Officers' motion for summary judgment (Doc. 161) is **GRANTED** on Plaintiff's individual capacity § 1983 claims.

IV. <u>PLAINTIFF'S STATE LAW CLAIMS AGAINST the ECSO OFFICERS IN THEIR INDIVIDUAL CAPACITY</u>

Lastly, the Court will address whether Plaintiff's state law claims against the ECSO Officers in their individual capacities are barred by official immunity. In Georgia, official or qualified immunity protects law enforcement officers from personal liability for discretionary acts taken within the scope of their official authority and performed without malice. <u>Gish v. Thomas</u>, 302 Ga. App. 854, 857, 691 S.E.2d 900, 904 (2010) (citing <u>Cameron v. Lang</u>, 274 Ga. 122, 123, 549 S.E.2d 341, 344 (2001)). Official immunity does not protect officers from liability for negligently performing ministerial acts or performing discretionary acts with malice or an intent to injure. <u>Cameron</u>, 274 Ga. at 123, 549 S.E.2d at 344.

The Georgia Supreme Court has described the difference between ministerial and discretionary acts as follows:

> A ministerial act is commonly one that is simple,
> absolute, and definite, arising under conditions
> admitted or proved to exist, and requiring merely the
> execution of a specific duty. A discretionary act,
> however, calls for the exercise of personal
> deliberation and judgment, which in turn entails
> examining the facts, reaching reasoned conclusions,
> and acting on them in a way not specifically directed.

McDowell v. Smith, 285 Ga. 592, 593, 678 S.E.2d 922, 924 (2009)

(quoting Murphy v. Bajjani, 282 Ga. 197, 199, 647 S.E.2d 54, 57

(2007)). Further, "[t]he determination of whether an action is

discretionary or ministerial depends on the character of the

specific actions complained of, not the general nature of the

job, and is to be made on a case-by-case basis." Id., 285 Ga. at

595, 678 S.E.2d at 925 (quoting Reece v. Turner, 284 Ga. App.

282, 285, 643 S.E.2d 814, 817 (2007)).

Plaintiff contends that providing medical care for inmates

is a duty imposed on prison officers by law and is therefore a

ministerial act. (Doc. 219, Attach. 2 at 13-15.) Plaintiff is

correct that simply providing access to medical care for an

inmate is a ministerial act by the sheriff and his or her

deputies. (Id. at 19 (citing Howard v. City of Columbus, 239 Ga.

App. 399, 411, 521 S.E.2d 51, 66 (1999).) However, "[t]he

determination of **what** medical treatment to provide **is** an act of

discretion subject to official immunity." Howard, 239 Ga. App.

at 411, 521 S.E.2d at 66 (emphasis in original) (quotation

omitted). In this case, Plaintiff contends that the ECSO

Officers' conduct was ministerial because they erred not in their choice of treatment for Cartee but in their complete denial of medical care for him. (Doc. 218, Attach. 2 at 19-20.)

Georgia courts have consistently held that a prison official's decision on how to provide medical care to inmates is discretionary under Georgia law. Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1310 (S.D. Ga. 2013) (collecting cases); see also Graham v. Cobb Cnty., 316 Ga. App. 738, 743, 730 S.E.2d 439, 444 (2012) (finding "the determination of how to provide adequate medical care to the prisoners at the jail involved the use of discretion by [the sheriff]"); Brooks v. Wilkinson Cnty., 393 F. Supp. 3d 1147, 1173 (M.D. Ga. 2019) ("[T]he determination about what care to provide is within the official's discretion[.]"). Although Plaintiff frames the ECSO Officers' conduct as completely denying Cartee's access to medical care, as the Court previously outlined, Cartee was referred to medical professionals several times throughout his incarceration. In reality, Plaintiff takes issue with the manner and nature of the care provided. Such determinations are clearly discretionary under Georgia law and entitle the ECSO Officers to raise the defense of official immunity.

Additionally, despite Plaintiff's cursory assertion to the contrary (Doc. 218, Attach. 2 at 20), there is no evidence to support a finding that any ECSO Officer acted with malice

towards Cartee. To show actual malice, a plaintiff must show that a defendant acted with "a deliberate intention to do wrong." Keele, 938 F. Supp. 2d at 1309 (quoting Peterson v. Baker, 504 F.3d 1331, 1339 (11th Cir. 2007)). As discussed throughout this order, Plaintiff has not shown that any ECSO Officer was aware that Cartee was suffering from a serious medical need such that their actions or inactions were causing him serious harm. See Bagwell v. Hall Cnty., No. 2:14-cv-00195, 2015 WL 1919956, at *6 (N.D. Ga. Apr. 28, 2015) (finding no actual malice where Plaintiff failed to allege officer intended to injure in failing to provide medical treatment). Because the Court finds that the ECSO Officers were engaged in discretionary conduct and did not act with malice, they are entitled to official immunity. Accordingly, summary judgment is **GRANTED** on Plaintiff's state law claims against the ECSO Officers in their individual capacity.[22]

## CONCLUSION

Based on the foregoing, Plaintiff's wrongful death claims brought in his capacity as the executor of the estate of Valerie Storey are **DISMISSED**. Additionally, the ECSO Officers' motion for summary judgment (Doc. 161) is **GRANTED**. As a result,

---

[22] Because the Court has concluded that the ECSO Officers are entitled to summary judgment with respect to all of Plaintiff's substantive claims, Plaintiff's punitive damages claims are likewise **DISMISSED**. See Mann, 588 F.3d at 1304-05 (11th Cir. 2009).

Defendants Ashby Lee Zydonyk, Bryan Shearouse, Cora Mae Gaines, Dorothy Hopf, Garett Buckles, Johnny Reinhart, Latonya Cooper, Leslie Minor, Paul Davis, Robert L. Brown, and Tiffany Tisby are **DISMISSED** from this action. Finally, the ECSO Officers' motion to exclude Plaintiff's expert testimony (Doc. 158) and Plaintiff's motion to exclude the ECSO Officers' expert testimony (Doc. 167) are **DENIED AS MOOT**.[23] The Clerk of Court is **DIRECTED** to amend the caption accordingly.

SO ORDERED this **31ˢᵗ** day of August 2022.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[23] The Court notes that the challenged experts opined on the relevant standard of care for prison officials. Because the Court has decided as a threshold matter that the ECSO Officers are entitled to qualified and official immunity from Plaintiff's claims, the proffered experts' testimony would not affect the Court's decision in this Order.