IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

KEITH STOREY, as Executor of
the Estate of Valerie Storey
and Executor of the Estate of
Kenneth Cartee,

      Plaintiff,

        v.

TRANSFORMHEALTHRX, INC; JOHN
DOES 1-20; ANISA GRANTHAM,
LPC, NCAC; REBECCA RANSOM,
LPN; JANE DOES 1-10; and JOHN
DOES PHYISICANS 1-5,

      Defendants.

CV 415-149

## O R D E R

Presently pending before the Court are: Anisa Grantham, Laura Busbin, Marilyn Spikes, Rebecca Ransom, and Transformhealthrx, Inc's ("THRX") (collectively, the "THRX Defendants") motion to exclude (Doc. 163); Plaintiff's motion in limine (Doc. 165); Plaintiff's motion to exclude (Doc. 168); and the THRX Defendants' motion for summary judgment (Doc. 171). For the following reasons, the THRX Defendants' motion to exclude is **GRANTED IN PART and DENIED IN PART**, the THRX Defendants' motion for summary judgment is **GRANTED IN PART and DENIED IN PART**, Plaintiff's motion in limine is **DENIED AS MOOT** and Plaintiff's motion to exclude is **DENIED AS MOOT**.

## I. BACKGROUND

The Court summarizes the relevant facts as well as the procedural background of the case thus far.

### A. Procedural Background

On September 8, 2014, Valerie Storey,[1] individually and as executrix of Kenneth Cartee's ("Cartee") estate (the "Estate"), filed a civil rights and tort action against Effingham County Jail (the "Jail"), Jimmy McDuffie, Effingham County Sheriff's Department, THRX, Effingham County Board of Commissioners, and 35 John and Jane Does. <u>Storey v. Effingham Cnty. Jail</u>, No. 4:24-cv-194, (Doc. 1, at 1) (S.D. Ga. Sept. 8, 2014). On November 25, 2014, the Court dismissed the action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). <u>Id.</u> (Doc. 32, at 1).

On May 20, 2015, Ms. Storey, individually and as executrix of the Estate, filed this renewal action alleging multiple federal and state law causes of action against several individuals and entities involved in Cartee's incarceration and medical treatment. (Doc. 1.) On June 22, 2015, Ms. Storey filed her First Amended Complaint. (Doc. 37.) On August 30, 2015, Ms. Storey filed her Second Amended Complaint (hereinafter, the "Complaint") - the

---

[1] Ms. Storey is Cartee's biological daughter. (Doc. 202-1, at 3.) However, William Lamar Newman adopted Ms. Storey in 1981 after marrying Estella Nelson, Ms. Storey's mother. (<u>Id.</u>) Cartee's parental rights over Ms. Storey were terminated during this adoption. (Doc. 157-1, at 5.)

operative complaint. (Doc. 72.) Following Ms. Storey's death, her husband, Keith Storey, was substituted as the party plaintiff (hereinafter, "Plaintiff"). (Doc. 137).

The Court previously ruled on several motions for summary judgment. On February 1, 2022, the Court granted Defendants Effingham County, Effingham County Board of Commissioners, and Jimmy McDuffie's motion to summary judgment. (Doc. 254.) On August 31, 2022, the Court granted Defendants Ashby Lee Zydonyk, Bryan Shearouse, Cora Mae Gaines, Dorothy Hopf, Garett Buckles, Johnny Reinhart, Latonya Cooper, Leslie Minor, Paul Davis, Robert L. Brown, and Tiffany Tisby's (collectively, the "ECSO Officers") motion for summary judgment. (Doc. 259.) Most recently, on February 20, 2024, the Court granted in part Dr. Rahimi's motion for summary judgment, terminating him as a party to this action. (Doc. 262.) There have also been several stipulations of dismissal (Docs. 242, 249, 251), so the only remaining Defendants are the THRX Defendants. Additionally, the Court previously found Ms. Storey lacked standing to bring a wrongful death claim in her individual capacity because she was adopted before Cartee's death; thus, Plaintiff lacks standing to bring a wrongful death claim in his capacity as executor of Ms. Storey's estate. (Doc. 259, at 24.) But the Court also found Plaintiff has standing to pursue a wrongful death claim in his capacity as executor of Cartee's Estate. (Id.)

3

Plaintiff brings federal and state law claims against the THRX Defendants, asserting: (1) deliberate indifference, delay in treatment, and failure to train or implement policies and practices under 42 U.S.C. § 1983 and (2) medical malpractice, pain and suffering, and wrongful death under Georgia law.[2] (Doc. 72, at 22-30.)

## B. Factual Background

The facts relevant to this Order are as follows.[3] On September 9, 2012, Cartee called Ms. Storey and told her he planned to commit suicide. (Doc. 246-1, at 130.) Because of Cartee's history of self-harm, Ms. Storey called 911 and drove to his house. (Id. at 3, 131.) The police arrived and tried to persuade Cartee to go to the hospital for a mental evaluation, but he refused so the police departed, and Ms. Storey stayed. (Id. at 4.) After the police left, Cartee put a knife to Ms. Storey's throat and said if he was going, then she was going too. (Id.) Another witness distracted Cartee, placed Ms. Storey in his car, drove to a neighbor's house, and called 911 again. (Id.)

---

[2] The Complaint broadly asserts "Federal Claims under 42 U.S.C. § 1983" and "Claims under Georgia Law" without specifically enumerating each claim he brings. Thus, out of an abundance of caution, the Court lists numerous types of claims from what it appears are pled in the Complaint. (Doc. 72, at 22, 25.)

[3] The THRX Defendants filed a consolidated reply to Plaintiff's SUMF that contained the THRX Defendants' initial statements, Plaintiff's response, and their reply, as well as Plaintiff's initial statements and the THRX Defendants' responses. (Doc. 246-1, at 2-3.) Because this is a consolidated format, the Court refers to this document for the undisputed material facts.

The police again responded and found Cartee disheveled and unkempt and a knife on the ground. (Id. at 6.) Deputy Schaffer tried to obtain information from Cartee, but he was either unresponsive or would say "it doesn't matter." (Id.) Corporal Shearouse observed an unlabeled pill bottle in Cartee's pocket with several types of pills. (Id. at 7.) Cartee would not identify the pills and would not say if he had taken any medication, so emergency medical services ("EMS") was called and Cartee agreed to go to the hospital. (Id.) Before the ambulance reached the hospital, Cartee decided he no longer wanted to go and exited the ambulance. (Id.) At that time, Corporal Shearouse, who was following the ambulance, determined Cartee met the criteria for an involuntary evaluation and took Cartee to the hospital in his patrol car. (Id.)

### 1. Initial Hospitalization and Arrest

Upon arrival at Effingham County Hospital, Cartee first actively resisted by stopping and pulling away, but then entered the hospital and sat in the emergency room. (Id.) Cartee was examined, it was determined the crisis unit did not need to be called, and Cartee was to be discharged once the hospital received a urine sample. (Id. at 8.) Corporal Shearouse removed one of Cartee's cuffs so he could provide the urine sample, but rather than giving the sample, Cartee walked towards Corporal Shearouse, scowling, pulling on his zipper, and mumbling. (Id. at 8-9.) As

Cartee approached Corporal Shearouse, Corporal Shearouse extended his arm telling Cartee to not come closer, but Cartee continued closer and raised his right hand in a closed fist in a manner to strike Corporal Shearouse. (Id. at 9.)  Corporal Shearouse grabbed the handcuff and pulled Cartee's arm down to prevent the strike, then put Cartee's hands behind his back and pushed him against the wall. (Id.)  Cartee refused to cooperate so Corporal Shearouse placed him on the ground, removed his taser, showed Cartee the taser, and warning Cartee he would be tased if he did not stop resisting. (Id. at 10.)  Cartee was not tased at the hospital. (Id.)  Corporal Shearouse tried to handcuff Cartee and applied pressure to his back to get Cartee to comply, then he handcuffed him and placed him onto the bench. (Id.)

Once Cartee was handcuffed again, Corporal Shearouse left the observation room and informed the physician of the incident and that Cartee would be arrested upon his release from the hospital. (Id.)  During the altercation, Cartee injured his wrist, so he was treated for that and then was given medical clearance and discharged. (Id. at 11.)  Cartee was charged with aggravated assault, possession of a controlled substance, and obstruction of law enforcement and was taken to the jail. (Id. at 11-12.)

2. Initial Detainment and Evaluation at the Jail

At the Jail, Corporal Shearouse excused himself to reduce the likelihood of causing Cartee further irritation and other officers

6

helped remove Cartee from the patrol car.  (Id. at 12.)  Cartee continued to resist the officers' commands to keep his hands on the counter and attempted to walk away, when the officers tried to grab him, he pulled away and the taser was deployed into Cartee's abdominal area.  (Id. at 13-14.)  Cartee was placed in a restraining chair in a holding cell for monitoring until he could be examined by a nurse.  (Id. at 16.)  When the nurse arrived, Cartee had to be physically removed from the restraint chair by the officers and then was strip searched.  (Id. at 17.)  Cartee refused to put on an inmate uniform and was given a suicide blanket to cover himself.  (Id. at 18.)

At all relevant times, THRX[4] provided medical care at the Jail.  (Id. at 133.)  Rebecca Ransom ("Nurse Ransom") was the full-time nurse at the Jail and employed by THRX.  (Id. at 30.) Nurse Ransom worked Monday through Friday, but THRX also had a pool of nurses that would cover if she could not work on any given day.  (Id.)  At the request of the Jail's captain, Nurse Ransom first saw Cartee in a holding cell in booking due to his behavior. (Id. at 31.)  Cartee appeared very confused in the restraint chair. (Id.)  Nurse Ransom first recalled Cartee's aggressive behavior,

---

[4] The THRX Defendants are state actors for purposes of Section 1983.  (Doc. 171-1, at 2 (citing West v. Adkins, 487 U.S. 42, 55-56 (1988); Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011))); see also Craig, 643 F.3d at 1310 ("'When a private entity . . . contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state' and 'becomes the functional equivalent of the municipality' under section 1983." (citation omitted)).

that he was a poor historian, disheveled, and uncoordinated in his thoughts. (Id. at 32-33.) Nurse Ransom took Catee's vital signs, including blood pressure temperature, oxygen saturation, pulse and respiration, and completed the initial assessment using the Subjective, Objective, Assessment, and Plan ("SOAP") notes. (Id. at 32.) Nurse Ransom also entered information from officers into the SOAP notes that Cartee was disoriented and combative with them. (Id. at 33.) Nurse Ransom was not informed Cartee was tased or taken to the ground and was unaware of any altercation between Cartee and the Jail staff. (Id. at 33, 41.) She did not know whether Cartee was disoriented because of drugs or a mental illness, so she made Brandy McDonald, her supervisor, aware. (Id. at 33.) Ms. McDonald advised Nurse Ransom to get an order from Dr. Pope, the Jail doctor, to send Cartee to the emergency room for a mental health evaluation. (Id. at 18, 33, 60.) Using On-Call, a telephone triage for correctional facilities that could be used by nursing and jail staff twenty-four hours a day, Cartee's case was referred to Dr. Pope. (Id. at 33-34.) It was a mutual decision of Nurse Ransom and the Jail's captain to send Cartee for physiological evaluation. (Id. at 37.)

   3. Psychological Evaluation Referral

   Cartee was transported back to Effingham Hospital for his psychological evaluation. (Id. at 39.) When officers removed him from the restraint chair for transport, Cartee became angry and

combative and was tased by the Jail staff to enable them to secure him in leg irons and handcuffs. (Id.) Officers Reinhart and Zydonyk transported Cartee to the hospital, and during transport he was combative and kicked the windows and doors of the patrol car. (Id. at 40.) When Cartee arrived at Effingham Hospital, hospital staff gave him three injections to calm him. (Id. at 41.)

On September 11, 2012, Officers Zydonyk and Singletary transported him to Georgia Regional Hospital ("GRH") in Savannah. (Id. at 42.) Cartee was admitted to GRH on September 11, 2012 and discharged on September 17, 2012. (Id.) Cartee was diagnosed with schizoaffective disorder and polysubstance abuse and was assigned involuntary medication administration for acute psychosis. (Id.)

4. Return to Jail

Cartee was transported back to the Jail on September 17, 2012 with instructions from Dr. Pechal that Cartee may be manipulative or act out and a recommendation that the Jail deny Cartee any sharp objects or items he could use to harm himself or others. (Id. at 43-44.) Deputy Plank arrived at GRH to transport Cartee back to the Jail and put leg irons and handcuffs on Cartee, and he walked to the car. (Id. at 45.) Upon arrival at the Jail, Cartee exited the car on his own and walked into the Jail. (Id.) Cartee's leg

shackles were removed, and he was placed in a holding cell. (Id. at 46.)

Nurse Ransom evaluated Cartee at the Jail on September 17, 2012. (Id. at 47.) Cartee was brought into medical in a wheelchair, and he claimed he could not walk. (Id.) When Cartee returned from GRH, he was less aggressive but still incapable of communicating with Nurse Ransom. (Id.) He was oriented to person, place, and time, but it was still difficult for him to communicate. (Id. at 49.) He could not put his thoughts in order and was a poor historian of his medical history. (Id. at 48.) Nurse Ransom completed an intake screening form to document his physical condition, and Cartee was responsible for answering the questions on it. (Id. at 48, 50.) Cartee stated he was "mentally handicapped" and provided history regarding seizures and memory loss, but he could not explain why he was in a wheelchair. (Id. at 50-51.) Cartee had no injuries upon arrival and denied he had any inflammation, difficulty breathing, or chest pain. (Id. at 51.)

Cartee was not disrobed during this evaluation. (Id. at 53-54.) Nevertheless, Nurse Ransom made these notes and observations: he did not appear to be suffering from head trauma; his neck was supple with no jugular venous distention and his lymph nodes did not appear swollen; his lungs were clear with no crackles or wheezing; he had normal percussion and respiratory effect; his

abdomen was nondistended and nontender and there was no rebound pain or guarding; she observed no inflammation of his spleen; no swelling on his fingers, legs, or toes; his skin was intact, free of rashes, and a normal range of motion in his hands and feet; he had equal grip strength in both hands; no obvious trauma to his legs and he was bending and moving both legs. (Id. at 55-56.)

On September 18, 2012, Officer Davis arrived to escort Cartee from isolation to a bond hearing at the booking desk. (Id. at 58.) Cartee claimed he could not walk despite walking at GRH and into the Jail the day before. (Id.) Officers Davis and Reinhart attempted to verbally coerce Cartee to walk and when he did not move, Officer David drive-stunned him on the lower thigh three times. (Id. at 59.) Officer Tisby then retrieved the wheelchair, and Cartee was escorted to booking without further incident. (Id.)

That same day, Anisa Grantham saw Cartee for the first and only time. (Id. at 62, 168.) Grantham is a licensed professional counselor ("LPC") and has worked with THRX since 2004. (Id. at 60-62.) Grantham worked one to two hours twice a week at the Jail, usually on Tuesdays and Fridays. (Id. at 61.) Cartee was on her list of inmates to see because he was a new patient, was in isolation, had a mental health history, and was taking medications. (Id. at 62, 169.) Based on her review of the intake notes from September 17, 2012, Grantham believe it would be appropriate to complete her evaluation of Cartee within 10 minutes. (Id. at 62.)

She noted Cartee could not walk other than going to the bathroom, and he wanted to go back to GRH.  (Id. at 63.)  His movements were selective, as he could bend his legs when he was asked to sit up. (Id.)  She stated his behavior was manipulative, and she was not convinced he could not walk.  (Id.)  She also noted he was disheveled with bruising and scabs on his arms and hands, but the scabs did not appear to be recent.  (Id. at 63-64.)  Grantham's duty was not to diagnose at the Jail, diagnosis would have been done by Dr. Pope, but she came in the mornings, and he usually came later in the day.  (Id. at 64.)  Grantham did not obtain inmates' history and physicals because that was a medical activity, and she had no medical background.  (Id. at 65, 166.)  The nursing staff was responsible for making sure Grantham had the medical information she needed, but if an inmate had serious mental problems, she would usually be able to detect that in her evaluation.  (Id. at 65.)  When Grantham saw Cartee on September 18, 2012, she did not find him to be so severely mentally ill that he needed to be removed from the Jail.  (Id.)  If an inmate is severely mentally ill, they are not going to be housed at the Jail because it is a liability.  (Id. at 123.)

Prior to his time at the Jail, Cartee received outpatient treatment three times a week at Gateway Behavioral Health ("Gateway").  (Id. at 68.)  On September 18, 2012, Nurse Ransom spoke with Gateway who confirmed they never witnessed Cartee in a

wheelchair and that he was always ambulatory with a cane.   (Id.)
However, on September 20, 2012, Cartee was still not able to walk
and required assistance to be transferred to the bed.   (Id. at
70.)

Nurse Ransom saw Cartee every day between September 17 and
September 20, 2012 at pill call when she gave him his medications.
(Id.)   She observed changes from his initial complaints on
September 17, 2012, and on September 20, 2012, she noticed he could
not sit up on his own, and his upper body strength was limited.
(Id. at 72.)   But Nurse Ransom stated he did not look like a man
who had been assaulted, and she saw no lacerations and did not
note any bruising.   (Id.)   She spoke with Dr. Pope who ordered
Cartee be sent back to the hospital, and he was sent within an
hour. (Id. at 73.)   The medical notes specified Nurse Ransom spoke
directly with Dr. Pope, which was not standard procedure, but she
made the decision to call Dr. Pope directly because she was
troubled by what she saw.   (Id.)

Cartee was evaluated at Effingham Hospital and diagnosed with
a t-spine fracture, sepsis, bilateral rib fractures, bruises and
contusions, urinary retention, renal failure, hematuria,
rhabdomyolysis, and a pressure sore.   (Id. at 74, 76.)   THRX is
unaware how Cartee received rib fractures or fractured his spine.
(Id. at 139-140.)   Nothing in the intake records from September
17, 2012, which were completed by Cartee and Nurse Ransom,

indicates he had any pressure sores, bruises, or infections.  (Id. at 140.)   Cartee was then transferred to Memorial Hospital in Savannah, Georgia.  (Id. at 75.)  He was discharged from Memorial Hospital on October 22, 2012 and admitted to Woodlands Rehabilitation.  (Id. at 77, 79.)  Cartee died on June 25, 2013. (Id. at 81.)  His cause of death was acute respiratory failure; cardiopulmonary arrest; and adult failure to thrive.  (Id. at 177.)

## II. THRX DEFENDANTS' MOTION TO EXCLUDE

The THRX Defendants move, pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), to exclude the testimony of Dr. Charles E. Potts, M.D.  (Doc. 163, at 1.)  Specifically, they argue Dr. Potts is not qualified to render causation opinions, and the assumptions he relies on are incorrect and not the product of reliable science.  (Id. at 2.) Most of their arguments rely on the fact Dr. Potts originally opined that the individual THRX Defendants met the standard of care and were not deliberately indifferent to the medical needs of Cartee; however, he then issued an errata sheet (the "Errata Sheet") changing his conclusions, finding the THRX Defendants did not meet the standard of care, and finding they were deliberately indifferent to Cartee's needs.  (Id.)  Thus, the THRX Defendants move to exclude him.  (Id.)

In response, Plaintiff argues Dr. Potts is qualified and his opinions are reliable.  (Doc. 182, at 7-9.)  He argues Dr. Potts

had the right to amend his answers substantively in the Errata Sheet, he timely did so, and the THRX Defendants did not move to strike the Errata Sheet or challenge it before now.  (Id. at 7.) Plaintiff believes the THRX Defendants should have moved to strike Dr. Potts' Errata Sheet before the Scheduling Order deadline for motions, and their delay in doing so does not allow the Errata Sheet to be the basis for excluding Dr. Potts.  (Id. at 8.) Furthermore, Plaintiff argues the THRX Defendants put forth no factual basis for Dr. Potts being unqualified or why his opinions are unreliable because of the "alleged 'flip flop' between the deposition and the [E]rrata [S]heet." (Id.)  The THRX Defendants replied, arguing Dr. Potts' resume does not make his testimony reliable or admissible.  (Doc. 198, at 2-3.)  They again emphasize his "testimony is based on nothing more than his personal beliefs or ipse dixit," which is an insufficient basis to provide expert testimony.  (Id. at 3.)  They also argue Dr. Potts is not qualified to testify, specifically because he does not meet the requirements of an expert under Georgia law.  (Id. at 13-15.)  As the gatekeeper, the THRX Defendants urge the Court to apply the Federal Rules of Evidence, Georgia rules for experts in medical malpractice cases, and Daubert to find Dr. Potts' testimony unreliable and inadmissible.  (Id. at 4-19.)

Dr. Potts submitted an expert report with an affidavit signed June 23, 2016 (Doc. 123-1, at 2-14) and an Errata Sheet dated March

3, 2017 (Doc. 163-4).[5] Dr. Potts is a physician trained in internal medicine and gastroenterology and licensed to practice medicine in all of its branches. (Doc. 123-1, at 4.) He practiced medicine from 1983 until 2011 and has 17 years of experience in correctional health care in Washington, D.C. and Maryland. (Id.) Because of his training, education, and experience, Dr. Potts is familiar with the standard of care for medical practices relating to the care and treatment of patients like Cartee. (Id.)

Dr. Potts reviewed the medical records of Cartee from his initial incarceration at the Jail to the diagnosis of "status post assault" at Effingham Hospital emergency room. (Id. at 5.) The records include the initial triage, referral to the emergency room for a mental health evaluation, and throughout his incarceration at the Jail, where clinical care was provided by THRX. (Id.) Based upon his review of the records, it is his opinion THRX and its employees; the nurse Defendants; Jimmy McDuffie, Effingham County Sheriff; and the jailer and officer Defendants breached the standard of care by:

> 1. Failing to ensure the safety of [Cartee] resulting in multiple trauma sustained September 17, 2012 and September 20, 2012[.]
> 2. Incompetently assessing his care during the interval September 17, 2012 and September 20, 2012 resulting in delay of treatment for his injuries resulting in undo suffering, neurological and organ damage.
> 3. Failed to report, investigate, or follow up on a manifest incident of abuse and neglect in a timely manner.

---

[5] The Errata Sheet is dated March 3, 2017; however, it was signed on April 16, 2017. (Doc. 163-4, at 1.)

(Id.)  Dr. Potts believes the THRX Defendants, including the nurse Defendants, "did not use such care as reasonably prudently healthcare providers practicing in the same field in the same or similar locality would have provided under similar circumstances." (Id. at 7.)  Dr. Potts believes these breaches, along with breaches by the Effingham County Defendants between September 17, 2012 and September 20, 2012, caused Cartee's diagnoses enumerated by Effingham Hospital of status post assault, including bruises, contusions, multiple rib fractures, T-11 thoracic spine fracture, rhabdomyolysis, dehydration, sepsis, and a Stage II sacral decubitus ulcer.  (Id. at 7-8.)

Dr. Potts was deposed March 3, 2017 and testified the individual THRX Defendants, specifically Nurse Ransom and Anisa Grantham, met the standard of care and were not deliberately indifferent to Cartee.  (Doc. 163-3, at 271-272.)  He also clarified he could not render an opinion on deliberate indifference or a breach of the standard of care for Laura Busbin, Brandy McDonald, and Marilyn Spikes because he did not have any information on their involvement with Cartee.  (Id. at 272.)  Dr. Potts testified he had issues with Cartee's care from intake on September 9, 2012, and he believes the intake assessment was incomplete.  (Id. at 60-61.)  Then, in his Errata Sheet prepared the same day of his deposition, he clarified his

> answer refers to the written content of the record.
> Documentation by [N]urse Ransom and Anitha Grantham may
> meet the standard of care as it pertains to data entry
> as a task.  My response is not a global generalized

> approval of the standard of care provided by [N]urse
> Ransom, Anitha Grantham, [THRX], or [the] Jail.
> Indifference was manifested by a failure to acknowledge
> [Cartee's] neuromuscular complains as legitimate and
> potentially progressive which resulted in a failure to
> follow up and reassess the consequence of which resulted
> in the deterioration of [Cartee's] physical condition
> compounded by physical assault and not until it was
> perceived that he was at risk of demise was he
> transported out of the facility for medical evaluation
> and intervention.

(Doc. 163-5, at 60.) Overall, he testified that while Cartee was

in the Jail, Nurse Ransom did not violate the standard of care.

(Doc. 163-3, at 140, 146.) However, in his Errata Sheet, Dr. Potts

clarified:

> My response is the literal interpretation of the
> question regarding actual text in the record. Conscious
> indifference and breach of the standard of care is
> evidenced by what is NOT in the record, i.e. absence of
> documentation related to follow up, reassessment of
> [Cartee's] physical and mental condition on rounds,
> vital signs, evidence[] that prescribed medication was
> given and what effect or side effects the medication may
> or may not have had. The greater the care of concern,
> the greater the documentation.

(Doc. 163-5, at 146.) These are a few clarifications the THRX

Defendants object to, arguing Dr. Potts "created" new answers

because his original ones undermined Plaintiff's case. (Doc. 163-

1, at 5-6.) Plaintiff denies these allegations, arguing Dr. Potts

is qualified and his testimony is reliable. (Doc. 182, at 7-9.)

The Court addresses the Parties' arguments below.

**A. Legal Standard**

Federal Rule of Evidence 702 provides:

18

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert opinion reflects a reliable application of the principles and methods to the facts of the case.

"As the Supreme Court recognized in [Daubert], Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003) (citing Daubert, 509 U.S. at 589). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. at 592 n.10).

The Eleventh Circuit has explained that district courts are to engage in a three-part inquiry to determine the admissibility of expert testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. Specifically, the court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41 (citations omitted).

First, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point of dispute. McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. In Daubert, the Supreme Court directed district courts faced with the proffer of expert testimony to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. Courts should consider four factors: (1) whether the theory or technique can be tested, (2) whether it has been

subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community.  Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citations omitted).  For example, experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (affirming admission of testimony from expert identifying firearms based upon years of experience working with firearms).  However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702, advisory committee's notes to 2000 amendment)).  Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but only whether or not the expert's testimony, based on scientific principles and

methodology, is reliable." In re Chantix Prods. Liab. Litig., 889
F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison v. McGhan
Med. Corp., 184 F.3d 1300, 1312 (11th Cir. 1999)).   "Vigorous
cross-examination, presentation of contrary evidence, and careful
instruction on the burden of proof are the traditional and
appropriate means of attacking shaky but admissible evidence."
Id. (citations omitted and alterations adopted).

Regardless of the specific factors considered, "[p]roposed
testimony must be supported by appropriate validation – i.e., 'good
grounds,' based on what is known." Daubert, 509 U.S. at 590.   In
most cases, "[t]he expert's testimony must be grounded in an
accepted body of learning or experience in the expert's field, and
the expert must explain how the conclusion is so grounded." Fed.
R. Evid. 702, advisory committee's notes to 2000 amendment.
"Presenting a summary of a proffered expert's testimony in the
form of conclusory statements devoid of factual or analytical
support is simply not enough" to carry the proponent's burden.
Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d
1092, 1113 (11th Cir. 2005).   Thus, "if the witness is relying
solely or primarily on experience, then the witness must explain
how that experience leads to the conclusion reached, why that
experience is a sufficient basis for the opinion, and how that
experience is reliably applied to the facts." Frazier, 387 F.3d
at 1261 (citation omitted) (alterations in original).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591. To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id.; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

"Federal Rule of Civil Procedure 30(e) allows a deponent 'to review the transcript or recording of a deposition and, if there are charges in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.'" ChemFree Corp. v. J. Walter, Inc., No. 1:04-CV-3711, 2008 WL 5234247, at *1 (N.D. Ga. Sept. 30, 2008) (quoting FED. R. CIV. P. 30(e)). The changes usually come through an errata sheet, "which is an attachment to a deposition transcript containing the deponent's corrections upon reading the transcript and the reasons for those corrections." Id. (citation and quotation marks omitted).

## B. Discussion

The THRX Defendants move the Court to exclude Dr. Potts' testimony because he "created" the Errata Sheet answers "out of

thin air," and they are the type of *ipse dixit* testimony <u>Daubert</u> was designed to eliminate. (Doc. 163-1, at 6.)  Plaintiff argues the THRX Defendants' motion is based on their "displeasure" with the fact Dr. Potts amended some of his answers.  (Doc. 182, at 4.)  But Plaintiff contends Dr. Potts had a right to do so under Rule 30(e), and such clarification does not affect his qualifications or reliability. (<u>Id.</u>)

1. <u>Qualifications</u>

The qualification requirements of Dr. Potts are twofold. First, he must meet the requirements under the Federal Rules, outlined above.  Further, because the case involves a medical malpractice claim under Georgia law, Dr. Potts must meet the Georgia law qualification requirements.  O.C.G.A. § 24-7-702 requires an expert testifying in a medical malpractice case about the acceptable standard of conduct of the professional to be "licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time."  Additionally, for medical malpractice cases in Georgia, the expert must have:

> actual professional knowledge and experience in the area
> of practice or specialty in which the opinion is to be
> given as the result of having been regularly engaged in:
>
>> (A) The active practice of such area of specialty
>> of his or her profession for at least three of the
>> last five years, with sufficient frequency to
>> establish an appropriate level of knowledge, as
>> determined by the judge, in performing the
>> procedure, diagnosing the condition, or rendering
>> the treatment which is alleged to have been

24

performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; and

(C) Except as provided in subparagraph (D) of this paragraph:
     (i) Is a member of the same profession;
     (ii) Is a medical doctor testifying as to the standard of care of a defendant who is a doctor of osteopathy; or
     (iii) Is a doctor of osteopathy testifying as to the standard of care of a defendant who is a medical doctor; and

(D) Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, nurse practitioners, certified registered nurse anesthetists, nurse midwives, physician assistants, physical therapists, occupational therapists, or medical support staff, has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider. However, a nurse, nurse practitioner, certified registered nurse anesthetist, nurse midwife, physician assistant, physical therapist, occupational therapist, or medical support staff shall not be competent to testify as to the standard of care of a physician.

O.C.G.A. § 24-7-702(c)(2).

As to the Federal Rules, the Court finds Dr. Potts is qualified due to his experience.  He has an extensive history in both correctional facilities and private practice over the course of his career.  (Doc. 182-1, at 6-10.)  Given the facts of Cartee's case and the THRX Defendants' status as medical providers in a jail, Dr. Potts' experience corresponds to the relevant subject matter.  See Anderson, 2014 WL 8103792, at *7 (citation omitted).  Based on this, the Court finds Dr. Potts qualified as an expert under the Federal Rules.  The Court now turns to his qualifications under Georgia law.

Defendants argue in their reply that Dr. Potts is not qualified under O.C.G.A. § 24-7-702(c) to offer standard of care opinions because his role as a clinician ended in 2011 when he stopped seeing inmates/patients.  (Doc. 198, at 3 n.2.)  Although this was not explicitly raised in the THRX Defendants' motion to exclude, the Court still reviews this issue as it carries out its gatekeeping role.  See Frazier, 387 F.3d at 1260 ("Rule 702 compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert . . . evidence."); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998) (taking no issue with district court that excluded expert testimony sua sponte, only reversing on other grounds).  Dr. Potts' curriculum vitae illustrates he has not actively practiced medicine since 2011, thus he is not qualified under sub-section (A).  (Doc. 182-1, at 6); O.C.G.A. § 24-7-702(c)(2)(A).  Further,

26

he has not taught for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession; thus, he is not qualified under sub-section (B).  O.C.G.A. § 24-7-702(c)(2)(B). Based on his failure to meet one of these two requirements, Dr. Potts is not qualified under Georgia law to testify as to the standard of care for Plaintiff's state law medical malpractice claim.

Despite his statutory qualifications for Plaintiff's federal claim, the THRX Defendants argue Dr. Potts is not qualified to render a causation opinion because of the "flip-flop" between his deposition and Errata Sheet.  (Doc. 163-1, at 10.)  The THRX Defendants base this argument on Dr. Potts' "lack of knowledge of the objective criteria, his professed lack of understanding of the roles of the participants, and the actual facts of this case." (Id. at 10-11.)  They also argue Dr. Pott's opinions do not "fit" the facts.  (Id. at 11.)  The Court finds these arguments are more properly addressed under the reliability and "fit" prongs of its analysis below.

Based on the foregoing, the Court finds Dr. Potts is qualified as an expert under the Federal Rules of Evidence, but not under Georgia law for medical malpractice opinions.  Dr. Potts' testimony will be inadmissible in support of Plaintiff's Georgia medical malpractice claims.  The Court addresses the additional prongs of

admissibility as they pertain to Dr. Potts' testimony in support of Plaintiff's federal claim.

   2. Reliability

   The THRX Defendants take issue with the inconsistencies of Dr. Potts' testimony, the fact his causation opinions are not tied to the facts of the case, his lack of understanding of the roles of the participants, and because his opinions are *ipse dixit*, thus unreliable and speculative.   (Doc. 163-1 at 6-7, 10-11.)   In response, Plaintiff conclusively asserts the THRX Defendants provide no factual basis for why Dr. Potts' opinions are unreliable.  (Doc. 182, at 8.)

   While the use of an errata sheet is acceptable under Rule 30(e), there is a split among courts in the Eleventh Circuit as to whether it can be used to make substantive changes or not.  See Norelus v. Denny's Inc., 628 F.3d 1270, 1281 (11th Cir. 2010) (explaining that some cases hold errata sheets do not allow material changes and some hold errata sheets can be used to make any types of changes) (citations omitted).   "The Eleventh Circuit has not held which standard applies in this Circuit[.]"  Candy Craft Creations, LLC v. Gartner, No. CV 212-091, 2015 WL 1541507, at *11 (S.D. Ga. Mar. 31, 2015) (citing Reynolds v. I.B.M. Corp., 125 F. App'x 982 (11th Cir. 2004)).  However, courts agree that if a substantive change is allowed, the party proffering the change must provide sufficient justification as required by Rule 30(e). Id. (citing EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 268

(3d Cir. 2010)); Fᴇᴅ. R. Cɪᴠ. P. 30 (e) ("[T]he deponent must be allowed 30 days after being notified . . . that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and *the reasons for making them.*" (emphasis added)).

Because errata sheets are acceptable, the Court finds it improper to classify Dr. Potts as unreliable simply because he utilized this permissible form of correcting his deposition. That said, the Court takes issue with the fact many of his corrections are not connected to the facts and do not contain sufficient justification as required by Rule 30(e). While this is likely a consideration for the "fit" of his testimony, the Court also addresses the THRX Defendants' arguments that Dr. Potts' opinions are simply *ipse dixit*. (Doc. 163-1, at 6-7.)

> Nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. This consideration has been incorporated into the text of the amended Rule 702, which requires not only that the testimony be the product of reliable principles and methods . . . but also that the testimony be based upon sufficient facts or data.

<u>Frazier</u>, 387 F.3d at 1275 n.10 (citations and quotation marks omitted and alterations adopted). The Eleventh Circuit has warned against "[r]eliance on naked assurances of the purported expert." <u>Dukes v. Georgia</u>, 428 F. Supp. 2d 1298, 1315 (N.D. Ga. 2006) (citing <u>Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.</u>,

402 F.3d 1092 (11th Cir. 2005); <u>McClain v. Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1244 (11th Cir. 2005)).

In Dr. Potts' Errata Sheet, he twice adds standard of care opinions for the individual THRX Defendants. (Doc. 163-5, at 60, 82.) During his deposition, he testified the nurse Defendants did not violate the standard of care, but in his Errata Sheet, he clarifies that in the limited scenario questioned, there was no breach, but then provides a general overview of what he thinks should have been done and how indifference can be presented. (<u>Id.</u>) These additions are not only disconnected to the facts, which the Court addresses below, but they also do not explain how they are based on reliable methods and principles or why he changed his opinion from his deposition. For example, Dr. Potts states "[i]ndifference was manifested by a failure to acknowledge [Cartee's] neuromuscular complains as legitimate and potentially progressive . . . ." (Doc. 163-5, at 60.) But beside this broad contention, Dr. Potts fails to explain how this breached the standard of care or what causes these actions to be classified as "indifference." Rule 702 requires an expert's opinions "be grounded in an accepted body of learning or experience in the expert's field" and requires the expert "explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's notes to 2000 amendment. Dr. Potts failed to do so. Without a connection between his standard of care opinions, and which of the Defendants'

actions constitute indifference, the Court finds Dr. Potts' Errata Sheet opinions are not reliable.

### 3. "Fit"

Finally, the THRX Defendants argue Dr. Potts' opinions are not tied to the facts or likely to assist the trier of fact.  (Doc. 163-1, at 11.)  The Court construes this as an argument of "fit," and Plaintiff provides no response.  (See Doc. 182.)  To satisfy the "fit" requirement, Dr. Potts' testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of Plaintiff's case.  Daubert, 509 U.S. at 591.

As outlined above, Dr. Potts' Errata Sheet additions do not "fit" the facts because he added opinions about how indifference is manifested and how the standard of care is breached by looking outside the record, and he failed to connect his general conclusions to a specific Defendant or to specific acts.  (See Doc. 163-5, at 60, 82, 146.)  It appears Dr. Potts used this opportunity to insert his generalized conclusory opinions about the outcome of the case, but such conclusions do not help a jury when they are not linked to specific Defendants or actions.  In comparison, Dr. Potts' expert report states the THRX Defendants breached the standard of care by: "[f]ailing to ensure the safety of [Cartee] resulting in multiple trauma," "[i]ncompetently assessing [Cartee's] care . . . resulting in delay of treatment for his injuries resulting in undo suffering, neurological and

31

organ damage," and "[failing] to report, investigate, or follow up on a manifest incident of abuse and neglect in a timely manner." (Doc. 123-1, at 5.)  He then provides specific events that occurred on various days that he connects to these conclusions, so the Court finds these opinions "fit" the case as they are linked to specific Defendants and actions.  (Id. at 6-7.)  Dr. Potts' expert report opinions linked to specific facts are acceptable, but his Errata Sheet opinions not connected to any specific facts or Defendants shall be excluded.  Specifically, the Court excludes the following opinions from Dr. Potts' Errata Sheet as conclusory and in no way connected to the facts:

> Indifference was manifested by a failure to acknowledge his neuromuscular complaints as legitimate and potentially progressive which resulted in a failure to follow up and reassess the consequence of which resulted in the deterioration of his physical condition compounded by physical assault and not until it was perceived that he was at risk of demise was he transported out of the facility for medical evaluation and intervention.

> Supplement.  An impression based on initial information is accepted practice.  However, the standard of care is breached if additional monitoring, testing, or observation for change in condition is not sought or prescribed to follow up and confirm the initial impression is correct.  The subjective state of an individual, real, imagined, or feigned may change which can result in an accurate diagnosis.  Indifference is evidenced by the failure to follow up and reassess at appropriate intervals and [document] change in condition.

> Clarification.  My response is to the literal interpretation of the question regarding actual text in the record.  Conscious indifference and breach of the standard of care is evidenced by what is NOT in the

> record, i.e. absence of documentation related to follow
> up, reassessment of his physical and mental condition on
> rounds, vital signs, evidenced that prescribed
> medication was given and what effect or side effects the
> medication may or may not have had. The greater the care
> of concern, the greater the documentation.

(Doc. 163-5, at 60, 82, 146.)  These portions of Mr. Potts' opinion do not "fit" the facts of the case and will not assist the trier of fact in determining the issues before the Court.  As such, they should be excluded as it pertains to Plaintiff's federal claims against the THRX Defendants.

    4. <u>Conclusion</u>

    Based on the foregoing, the THRX Defendants' motion to exclude Dr. Potts (Doc. 163) is **GRANTED IN PART AND DENIED IN PART.** Specifically, the Court finds Dr. Potts is not qualified to testify as a medical malpractice expert under Georgia law; thus, his opinions are excluded as it relates to Plaintiff's state law claims against the THRX Defendants.  As to Plaintiff's federal claim, the specific portions of Dr. Potts' Errata Sheet listed above are also excluded as he provided no connection between the testimony and the specific facts of the case.


### III. THRX DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Plaintiff asserts the following claims against the THRX Defendants: Count 1 – 42 U.S.C. § 1983 for deliberate indifference to Cartee's medical needs in violation of the Fourteenth Amendment and Count 2 – Georgia medical malpractice in violation of O.C.G.A.

§ 9-11-9.1.   (Doc. 72, at 22-30.)   Plaintiff seeks punitive damages; compensatory damages; pain and suffering damages; and damages for companionship, aid and support, and the full value of Cartee's life.   (Id. at 27-30.)   The THRX Defendants move for summary judgment on all claims against them.   (Doc. 171-1.)

## A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "An issue of fact is 'material' if . . . it might affect the outcome of the case . . . [and it] is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted).   The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor."   United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).   The Court should not weigh the evidence or determine credibility. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations

omitted).  A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice.  See e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).

The THRX Defendants do not bear the burden of proof at trial, and therefore may "satisfy [their] initial burden on summary judgment in either of two ways."  McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1262 (N.D. Ala. 2013) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)).  First, they "may simply show that there is an absence of evidence to support [Plaintiff's] case on the particular issue at hand."  Id. (citation omitted).  If this occurs, Plaintiff "must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. (citation omitted).  Or second, the THRX Defendants may "provide affirmative *evidence* demonstrating that [Plaintiff] will be unable to prove [his] case at trial."  Id. (citation omitted and alterations in original).

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."  Preis v. Lexington Ins., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007).  Essentially, the Court has no duty "to distill every potential argument that could be made based upon the

materials before it on summary judgment." Id. (citing Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the Parties specifically cite and legal arguments they expressly advance. See id.

In this action, the Clerk of Court provided Plaintiff notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 173.)  For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.  Plaintiff responded to the motion (Doc. 229), and the THRX Defendants replied in support (Doc. 246).  The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.  In reaching its conclusions, the Court evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

## B. Discussion

The THRX Defendants contend summary judgment on all claims against them is proper for the following reasons: (1) Ms. Storey was adopted, thus she could not bring a wrongful death claim in her individual capacity; (2) Plaintiff, as executor of the estate of Ms. Storey, is not a proper party because Ms. Storey never had the right to a wrongful death claim; (3) Ms. Storey could have brought a wrongful death claim for Cartee's next-of-kin but she failed to do so; (4) Ms. Storey lacks standing to bring a next-

of-kin wrongful death claim because she failed to allege there was no surviving spouse, no child, or no parent; (5) Plaintiff's Georgia malpractice claims, which encompass his wrongful death claims, fail because Plaintiff cannot establish causation; (6) punitive damages are not recoverable in a Georgia wrongful death action; (7) Plaintiff cannot meet the applicable legal standard to succeed on his deliberate indifference, delay, and policy-and-procedure claims (8) fictitious party pleading does not toll the statute of limitations ("SOL") for the THRX Defendants; (9) the two-year SOL for personal injury claims bars Plaintiff's federal and state law claims. (Doc. 171-1, at 7-9.) Plaintiff opposes the motion on all grounds, except he concedes he cannot prove that Defendants Laura Busbin and Marilyn Spikes did not meet the legal standards, and, for this reason, he dismisses his claims against them. (Doc. 229-2, at 24.) Thus, the THRX Defendants' motion for summary judgment is **GRANTED** as it pertains to Defendants Laura Busbin and Marilyn Spikes.

Additionally, the Court already found Ms. Storey lacked standing to bring a wrongful death claim in her individual capacity because she was adopted before Cartee's death; thus, Plaintiff lacks standing to bring a wrongful death claim in his capacity as administrator of Ms. Storey's estate. (Doc. 259, at 24.) Thus, the THRX Defendants' motion is **GRANTED** as it pertains to Ms. Storey's wrongful death claim in her individual capacity. Furthermore, the THRX Defendants argue Keith Storey cannot

prosecute a claim Ms. Storey never had.  (Doc. 171-1, at 13.)  The Court agrees with this, and the THRX Defendants are **GRANTED** summary judgment on any individual capacity claims for wrongful death pending against them.  The Court addresses the remaining arguments below.

### 1. Next-of-Kin Wrongful Death Claim

The THRX Defendants argue Ms. Storey could have brought a wrongful death claim on behalf of Cartee's next-of kin, but she failed to do so.  (Doc. 171-1, at 15-16.)  They argue she erroneously brought a claim in her individual capacity instead of for the next-of-kin and the SOL expired on June 25, 2015, so all wrongful death claims against the THRX Defendants should be dismissed.  (Id.)  In response, Plaintiff argues the Plaintiffs were originally identified as Valerie Storey, individually and as the executrix of the Estate, thus indicating she brought a claim both individually and for Cartee's next-of-kin.  (Doc. 229-2, at 8-9.)  The Court already interpreted Ms. Storey's claims as brought both individually and as executrix of the Estate.  (Doc. 259, at 16.)  Thus, the THRX Defendants' motion is **DENIED** on this ground.

The THRX Defendants also argue Ms. Storey, as executrix, lacks standing to pursue a wrongful death claim because she failed to allege Cartee had no surviving spouse or children at the time of death, thus she failed to allege she, as executrix, had standing to assert a cause of action under O.C.G.A. § 51-4-5.  (Doc. 171-1, at 16-17.)  In response, Plaintiff argues the facts are

undisputed that Cartee died without a living spouse, child, or parents. (Doc. 229-2, at 9.) Further, he argues that if it was a matter of simply pleading these allegations in the complaint, he should be granted leave to amend his complaint to show Ms. Storey had standing when she filed suit. (Id. at 10.) The Court agrees with Plaintiff. This litigation has been on-going for many years, and the Parties agree Cartee died without a surviving spouse or children. (Doc. 246-1, at 129.) Because this fact is not in dispute, the Court excuses any pleading deficiency and lets this claim move forward as though it was properly pleaded. Thus, the THRX Defendants' motion is **DENIED** on this ground.

2. Remaining Georgia Claims

The THRX Defendants argue Plaintiff cannot prove his Georgia medical malpractice claims because causation in such a case must be established through admissible expert testimony because whether the alleged professional negligence caused Cartee's injuries is a question of specialized knowledge beyond the ken of a lay person. (Doc. 171-1, at 42 (quoting Zwiren v. Thompson, 578 S.E.2d 862, 864 (Ga. 2003)).) In response, Plaintiff argues Dr. Potts is qualified to testify and his opinions are reliable, and again asserting conscious indifference and breach of the standard of care are evidenced by what is not in the record. (Doc. 229-2, at 25.)

"To prove a medical malpractice claim in Georgia, a plaintiff must show: (1) the duty inherent in the health care provider-

patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." Knight v. W. Paces Ferry Hosp., Inc., 585 S.E.2d 104, 105 (Ga. Ct. App. 2003) (citing Zwiren, 578 S.E.2d at 864). "In order to establish proximate cause . . . the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." Zwiren, 578 S.E.2d at 865 (citations omitted). As the Court thoroughly explained above, Dr. Potts is not qualified to testify under Georgia law in a professional negligence case. Because of this, the Court granted the THRX Defendants' motion to exclude Dr. Potts' opinions as to the Georgia medical malpractice claims. Without an expert's testimony linking the THRX Defendants' alleged actions to Cartee's death and illness, Plaintiff's medical malpractice claim against them fails because he cannot prove causation.

Furthermore, even if Dr. Potts were qualified to testify under Georgia law, Plaintiff failed to point to specific evidence to prove the THRX Defendants violated the standard of care or caused Cartee injury or death. (See Doc. 229-2.) Without such evidence, Plaintiff's claims still fail. As such, the THRX Defendants are entitled to summary judgment on the Georgia medical malpractice claims, and their motion is **GRANTED** on this ground.

Because Plaintiff's malpractice claims encompass his wrongful death claims, those claims also fail and the THRX Defendants' motion for summary judgment is **GRANTED** as to them. Based on the fact all of Plaintiff's state law claims fail for a lack of causation, the Court finds it unnecessary to address the THRX Defendants' arguments in support of summary judgment pertaining to the statute of limitations and fictitious party pleading.[6]

### 3. Punitive Damages

Next, the THRX Defendants argue punitive damages are not recoverable in a wrongful death action without proof of intentional or willful acts of the Defendants; thus, the next-of-kin's wrongful death claim should be dismissed. (Doc. 171-1 at 27.) Further, they argue punitive damages would be permissible as part of the Estate's pain and suffering claim; but, since it is barred by the SOL, this claim also fails. (Id. at 27-28.) In response, Plaintiff argues the Estate can recover punitive damages as part of its claim for pain and suffering. (Doc. 229-2, at 12.) However, Plaintiff offers no argument in opposition regarding the next-of-kin's wrongful death claim. (See id.)

As to the next-of-kins's claim, the Court agrees with the THRX Defendants that punitive damages are recoverable only when

---

[6] The docket reflects that John Does 1-20, Jane Does 1-10, and John Does Physicians 1-5 are still Parties to the suit. Because fictitious party pleading is not permitted in federal court, the Clerk is **DIRECTED** to **TERMINATE** them as Parties. Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010) ("[F]ictitious-party pleading is not permitted in federal court." (citation omitted)).

the acts of the defendant are willful or intentional. (Doc. 171-1, at 27 (citing Roseberry v. Brooks, 461 S.E.2d 262, 268 (Ga. Ct. App. 1995)).)  Since there is no proof of willful or intentional conduct by the THRX Defendants, and Plaintiff does not dispute the motion on this basis, the THRX Defendants' motion for summary judgment is **GRANTED** on this ground.

As to the Estate's claim, since the Court has granted summary judgment on all the state law claims, Plaintiff's claim of punitive damages also fails.  "Awards of punitive damages and attorney fees are derivative of underlying claims; and where those claims fail, claims for punitive damages and attorney fees also fail." Nat'l Emergency Med. Servs., Inc. v. Smith, 889 S.E.2d 162, 173 (Ga. Ct. App. 2023) (citation omitted and alteration adopted).  Since Plaintiff's underlying claims under Georgia law, the THRX Defendants' motion for summary judgment is **GRANTED** as to punitive damages too.

4. Federal Claims under § 1983 for Deliberate Indifference, Delay, or Policy and Procedure Claims

Next, the THRX Defendants move for summary judgment, arguing Plaintiff cannot prove the elements of his deliberate indifference, delay, or policy and procedure claims. (Doc. 171-1, at 28-41.)  In response, Plaintiff argues THRX, Nurse Ransom, and Grantham did not meet the legal standards as to the medical care of Cartee. (Doc. 229-2, at 13.)  In reply, the THRX Defendants argue nothing in the record supports Plaintiff's constitutional

claims against them.  (Doc. 246, at 13.)  The Court considers the claims and Defendants in turn.

> a. *Deliberate Indifference and Delay*

A pretrial detainee, like Cartee was, has a right to adequate medical care under the due process clause of the Fourteenth Amendment.  Jackson v. West, 787 F.3d 1345, 1352 (11th Cir. 2015). "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the [Fourteenth] Amendment."[7]  Marsh v. Butler Cnty., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc) (citation omitted), *abrogated in part on other grounds by* Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007).  To show a constitutional violation and prevail on a claim of deliberate indifference to a medical need, a pretrial detainee must be able to show: "(1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  Mann v. Taser Int'l Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009) (citation omitted).   The second element, the deliberate indifference requirement, has two components – one subjective and one objective.  Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014).

> "To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) knew that an inmate faced a substantial

---

[7] See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007) (explaining Fourteenth Amendment governs pretrial detainee deliberate indifference claims but that the standards under the Fourteenth Amendment are identical to those under the Eighth).

> risk of serious harm." To satisfy the objective component, a plaintiff must produce evidence that the defendant "disregarded that known risk by failing to respond to it in an (objectively) reasonable manner."

Id. (citations omitted and alterations adopted). For the subjective component, "the defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 1099-1100 (citation and quotation marks omitted).

As to delay, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (citation omitted). "Where a plaintiff is harmed by a delay in the provision of medical care, courts consider: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1292 (S.D. Ga. 2013) (quoting Goebert, 510 F.3d at 1327) (internal quotation marks omitted). "[A]ccidental inadequacy, negligence in diagnosis or treatment, and medical malpractice are insufficient to sustain a claim of deliberate indifference." Id. (quoting Nimmons v. Aviles, 409 F. App'x 295, 297 (11th Cir. 2011) (internal quotation marks omitted and alterations adopted).

i. Rebecca Ransom

The THRX Defendants argue Nurse Ransom is entitled to summary judgment because Dr. Potts testified she met the standard of care and was not deliberately indifferent to Cartee. (Doc. 171-1, at 38-39.)  They argue Plaintiff has not subjectively proven Nurse Ransom had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that was more than gross negligence.  (Id. at 39.)  In response, Plaintiff goes through a thorough recap of Nurse Ransom's encounter with Cartee but provides no arguments about how she was deliberately indifferent or how she met the subjective and objective requirements of the claim.  (Doc. 229-2, at 13-19.)  Plaintiff makes no specific arguments about how Nurse Ransom was deliberately indifferent.  Instead, Plaintiff conclusory states "[i]t is apparent that the THRX Defendants were deliberately indifferent to the medical needs of Cartee, [and t]his is evidenced by the complete lack of any medical care or attention during Cartee's rapid deterioration of Cartee's health from September 17, 2012 through September 20, 2012." (Id. at 23.)  In reply, the THRX Defendants argue Plaintiff's assertions are unsupported by the undisputed facts. (Doc. 246, at 13.)  The Court agrees with the THRX Defendants.

Plaintiff failed to prove, or even argue, that Nurse Ransom was deliberately indifferent to Cartee's serious medical need or that there was a causal link between her actions and Cartee's injuries.  Despite failing to make any arguments, the Court knows

45

Plaintiff's expert, Dr. Potts, testified Nurse Ransom "improperly assessed [Cartee]" but then stated in his deposition she did not violate the standard of care by anything she *did*. (Doc. 123-1, at 6; Doc. 163-3, at 138-140.)   Dr. Potts later contended that Nurse Ransom violated the standard of care by what she *did not* do.   (Doc. 163-5, at 146.)   However, as outlined above, his later-offered opinion was unsupported by any facts and evidence and failed justify the change in testimony; thus, the Court excluded it. Because of this, the record is void of any evidence Nurse Ransom was deliberately indifferent when treating Cartee, or that her actions caused him injury.   Without such evidence, Plaintiff's claim against her for deliberate indifference fails.   Thus, the THRX Defendants are granted summary judgment on this ground.

As to delay, the THRX Defendants also argue Plaintiff cannot prove a claim of deliberate indifference because there is no evidence Nurse Ransom was aware of Cartee's medical need and that a delay attributable to her worsened his condition.   (Doc. 171-1, at 40.)   Plaintiff's response states, "there cannot be any contention that there was a delay in Cartee receiving medical care." (Doc. 229-2, at 24.)   The Court is unaware if this was unintentional or if it is an admission by Plaintiff that this claim fails.   In reply, the THRX Defendants argue Plaintiff failed to present evidence that Nurse Ransom was aware of Cartee's medical needs, and a delay of her own action worsened his condition.   (Doc. 246, at 16.)   The Court agrees with the THRX Defendants.   Plaintiff

has not carried his burden of showing Nurse Ransom was deliberately indifferent, either through delay or otherwise, to Cartee's medical needs.   As such, Nurse Ransom is entitled to summary judgment on the federal claims against her.

ii. Anisa Grantham

Turning to Grantham, the THRX Defendants argue she only saw Cartee once on September 18, 2012 after he returned from the hospital, and Dr. Potts testified she met the standard of care and was not deliberately indifferent.   (Doc. 171-1, at 37.)   In response, Plaintiff recaps Grantham's notes and interaction with Cartee, but like with Nurse Ransom, makes no specific arguments as to how Grantham was deliberately indifferent.  (Doc. 229-2, at 20-22.)   Plaintiff only presents the conclusory argument that the THRX Defendants were deliberately indifferent to the medical needs of Cartee.  (Id. at 23.)

Plaintiff failed to prove, or even argue, that Grantham was deliberately indifferent to Cartee's serious medical need or that there was a causal link between her actions and Cartee's injuries. Once again, Dr. Potts testified Grantham was not deliberately indifferent.  (Doc. 163-3, at 271.)  Similar to Nurse Ransom, Dr. Potts' change in opinion about Grantham was excluded because of his failure to qualify it, connect it to the facts, or justify his change.  (See Doc. 163-5, at 60.)  Based on this, the Court finds Plaintiff failed to provide evidence Grantham was deliberately

indifferent to Cartee's medical needs.  Thus, the THRX Defendants'
motion is granted on this ground.

As to delay, the THRX Defendants argue Plaintiff cannot
present evidence that Grantham was aware of Cartee's medical need,
a delay attributable to her worsened his condition, or what the
reason for the delay was.  (Doc. 171-1, at 38.)  Plaintiff's
response is the same as outlined above for Nurse Ransom, providing
no argument in opposition.  (See Doc. 229-2, at 20–23.)  As such,
and because there is no clear evidence Grantham did anything to
delay Cartee receiving medical treatment, this claim also fails,
and Grantham is entitled to summary judgment on the federal claims
against her.

b. *Policy and Procedure*

Next, the THRX Defendants argue THRX, as a private entity
performing a function that is traditionally the prerogative of the
state, can only be liable under § 1983 if there is a policy or
custom that resulted in a constitutional violation.  (Doc. 171-1,
at 40.)  "[A] local government may not be sued under § 1983 for an
injury inflicted solely by its employees or agents.  Instead, it
is when execution of a government's policy or custom . . . inflicts
the injury that the government as an entity is responsible under
§ 1983."  Monell v. Dep't of Soc. Servs. of City of New York, 436
U.S. 658, 694 (1978).  Plaintiff "must prove that [TRHX] had a
'policy or custom' of deliberate indifference that led to the
violation of [Cartee's] constitutional right."  Craig, 643 F.3d at

1310 (citing <u>Monell</u>, 436 U.S. at 694). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a municipality." <u>Id.</u> (citing <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985)). "[A] custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." <u>Id.</u> (citation and quotation marks omitted and alterations adopted).

Plaintiff argues:

> It was the custom and practice of the THRX Defendants not to[] provide adequate medical care to its inmates in several ways. They allowed jail staff to determine when an inmate was to be examined about tasing and after inmates had been taken down. It was the practice of the THRX Defendants to physically evaluate the inmates fully clothed. There was a complete disregard for any safety concerns of the inmates. There was no practice of inmates who were to be in the line of sight observation to be actually so observed whether by these Defendants directly or getting such information from jail staff performing such observations.

(Doc. 229-2, at 24.) In essence, Plaintiff repeats the facts he takes issue with, and argues that because certain acts happened to Cartee, it *had to have been* the custom and practice of THRX. However, Plaintiff points to no prior similar incidents, no actual customs or policies, and truly no support for his allegations. (<u>See</u> <u>id.</u>) As outlined above, Plaintiff is required to prove a *widespread* practice, and beyond his own contentions, he has asserted nothing to prove these actions were the widespread practice of THRX. <u>See</u> <u>Craig</u>, 643 F.3d at 1310. Plaintiff's "proof

of a policy or custom rests entirely on a single incident of alleged unconstitutional activity" and that is "not sufficient to impose liability." Id. at 1311.  Without evidence to support his claim, THRX is entitled to summary judgment on the deliberate indifference claims against it.

## IV. PLAINTIFF'S MOTIONS

Finally, Plaintiff filed two motions: (1) motion in limine to exclude evidence offered by the THRX Defendants that was not produced in response to discovery requests (Doc. 165); and (2) motion to exclude expert for the THRX Defendants (Doc. 168).  The THRX Defendants oppose both motions.  (Docs. 179, 180.)

Plaintiff's motion in limine seeks to prevent the THRX Defendants from offering at trial any evidence that should have been, but was not, produced in discovery.  (Doc. 165, at 2.) Because the Court has granted the THRX Defendants judgment on all motions pending against them, the case will not proceed to trial. Thus, Plaintiff's motion in limine (Doc. 165) is **DENIED AS MOOT**.

Plaintiff also moves to exclude expert testimony from the THRX Defendants due to a failure to designate their experts in line with the Court's deadlines.  (Doc. 168, at 1.)  Since there will be no trial, this motion is also **DENIED AS MOOT**.

## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the THRX Defendants' motion to exclude Dr. Potts (Doc. 163) is **GRANTED IN PART AND DENIED IN PART**, the THRX Defendants' motion for summary judgment (Doc. 171) is **GRANTED IN PART AND DENIED IN PART**, Plaintiff's motion in limine (Doc. 165) is **DENIED AS MOOT**, and Plaintiff's motion to exclude (Doc. 168) is **DENIED AS MOOT**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** for Defendants, and against Plaintiff, pursuant to this Order and the previous Orders of the Court, **TERMINATE** all pending motions and deadlines, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 26th day of March, 2024.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA